744 A.2d 190 (2000)
NORTHEAST TOWERS, INC., Plaintiff-Respondent,
v.
ZONING BOARD OF ADJUSTMENT OF the BOROUGH OF WEST PATERSON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued December 13, 1999.
Decided January 24, 2000.
*191 Richard Brigliadoro, Parsippany, for defendant-appellant (Weiner Lesniak, attorneys; Mr. Brigliadoro, on the brief).
Remo A. Caputo, Denville, for plaintiff-respondent.
Before Judges PETRELLA, CONLEY and BRAITHWAITE.
The opinion of the court was delivered by PETRELLA, P.J.A.D.
After the Law Division overturned the denial of a variance to Northeast Towers, *192 Inc. (Northeast), the Zoning Board of Adjustment of the Borough of West Paterson (the Board) appealed. The Board had denied Northeast's variance application to construct a 95-foot lattice communications tower next to an existing home on property in a residential zone. A 97-foot monopole had existed illegally on the property for a number of years and was proposed to be replaced.
On its appeal the Board argues that the decision of the Law Division Judge was erroneous because the Board's decision was neither arbitrary, capricious nor unreasonable. The trial judge reversed the Board's denial of Northeast's variance application to replace an illegal communications tower in a residential zone with a higher tower to be placed closer to the residence. The Board further argues that its denial of a variance for the proposed tower did not violate the Telecommunications Act of 1996.[1]
Northeast owned a three-quarter-acre property at 2 Oak Ridge Road on Garret Mountain in West Paterson in a Residential A Zone. The property contained a three-bedroom ranch house with a two-car garage. About twenty-five years ago a 97-foot high steel monopole communications tower had been erected in the middle of the backyard about forty or fifty feet from the residence. Under the zoning ordinance this was a non-permitted use and thus was illegal. The house was rented to tenants who had no relationship to the operation of the tower.
Northeast's President, George Stites, acquired the property in January 1993. Before that he managed it for four years for the previous owners. Stites's management of the property involved obtaining contracts to lease rights to place a broadcasting antenna on the tower by various individuals or entities who could transmit and receive signals at the site. Stites had about forty "tower accounts" for radio common carriers that put an antenna on the tower to transmit for the carriers' communications systems. The leases were long-term and involved several thousand dollars per year. According to the record, Stites had tower accounts in various locations. He had four companies with antennae on his West Paterson tower: Page Net of New York, Page Net of New Jersey, Tel-Air Communications (Tel-Air), and Message Center Beepers. Transmitters for each of the different companies were located inside a shed on the property. These companies were all in the business of offering paging communications for profit and rented an antenna connection to provide transmitting capabilities for "tens of thousands" of their accounts. Fees for the right to transmit from the tower were unregulated.
Stites and his wife were sole owners of Tel-Air, which owned nineteen other transmitting sites. In addition to the tower accounts, Tel-Air serviced 20,000 "paging accounts" for individuals with billings of approximately $10 to $15 per month.
In response to an inquiry by Stites to add additional antennae to the tower, West Paterson's code enforcement officer informed him on April 6, 1993, that the installation of radio antennae for the purpose of renting them to business entities in this district violated the borough's zoning ordinance. Accordingly, the code enforcement officer directed Stites to stop installing antennae and remove all antennae installed since he purchased the property. On June 9, 1993, the code enforcement officer denied a permit to an electrical contractor who sought to install a sub-panel in the shed to increase the electrical service for the tower's antennae. The reason for the denial was that the tower violated Section 22.5.1 of the borough's ordinance, operating a business in a residential zone. The code enforcement officer, as a result of these inquiries, investigated whether the tower was an approved use in the zone and sought the municipal attorney's opinion. After concluding that the *193 use was impermissible, the mayor and council were notified. Other properties with operating antennae for business were notified to stop doing business immediately.
Northeast applied for a use variance in November 1993, indicating that the first antenna was added in 1989 and the "last activity" on the site was October 30, 1994. The variance application sought (1) permission to allow replacement of the current tower with a 95-foot tower on a base elevation 10 feet higher than the existing tower's; (2) allowance of expansion of a nonconforming use; (3) setback and side yard variances; and (4) relief from height restrictions in a residential zone. There had been no prior application for a use variance or for construction of the shed and the electrical services.
Plaintiff argued that the communications tower was an inherently beneficial use. The residential use of the property was to be continued, and maintenance of the tower would not require the presence of employees or deliveries by commercial vehicles. The site would be serviced once a year under normal circumstances. Although the precise role and extent of the Federal Communications Commission's (FCC) regulation of the tower's function are not clear from the record, Stites indicated that a common carrier had exclusive territory granted by the FCC on the particular frequency allotted to the carrier. He also indicated that paging companies establish a pattern of site locations to cover with their transmissions so that coverage would be complete and no pages would be lost. He stated that moving his location might require two or three other locations to cover the same pattern and that FCC permission would be needed to move an antenna, a "station license." He indicated the new tower would have the potential to support cellular communications, but he did not presently have the opportunity to use the tower for that purpose.
The record indicates that there were at least three communication towers within a tenth of a mile from the Oak Ridge tower. Stites had not inquired as to whether he could place Tel-Air's antennae and transmitters on those towers.
Northeast's structural engineering expert reviewed design plans, including the structural integrity of the proposed tower. Because soil borings had not yet been taken, he was not clear as to the design of the concrete pad for anchoring and how the tower was to be anchored to the ground. The new tower was designed to hold fifty-two antennae which could weigh from 900 to 4,000 pounds. A real estate appraiser testified on Northeast's case before the Board and described the area surrounding the tower as "a fully developed residential neighborhood" with twenty-five or thirty-five-year-old, well-maintained homes on one-third to one acre sites. The area was said to be a stable community with a good reputation for preserving property values and containing some of the largest zoning in the municipality. The appraiser testified that based on his studies there "seems to be no effect on the value of surrounding properties when a tower is properly erected on a given lot." In his view there would be no negative impact on the value of the subject property, surrounding properties or the neighborhood, but this included the premise that the buyer of the subject property would have the option of removing the tower or using it. The appraiser conceded that except for Fair Lawn, other towers reviewed were much more distant from the nearest homes.
Northeast also had a planner testify as an expert in planning and land use impact with respect to communications facilities. He described Garret Mountain as the first major topographical change between the Palisades and Parsippany. The height was a significant factor with respect to "line of sight technology" and signals had to be seen by facilities sending or receiving that signal. He described the facilities as acting like an umbrella to cover a certain radius. He considered the situation *194 "unique" because "a lot of these facilities are already there"; the "existing monopole is situated on the property"; and "these antennas and radio equipment which are necessitated to be here are an integral component of the overall communications system for the pagers and the other wireless facilities" that the owner leases to. He also considered the tower a "quasi-public nature" use because it was FCC regulated, although it is not regulated by New Jersey as a public utility. He acknowledged that the FCC did not regulate the number of users or antennae permitted on the tower or the fees generated. According to him, there were other antennae on the roofs of homes in the area and one nearby structure had two free-standing, three-legged towers. However, he was unaware of whether those facilities were for commercial or private use. He expressed the opinion that "stimulation of commerce benefits the public welfare and good of all the residents of New Jersey," although he acknowledged that the zoning statutes contain no such criteria. Also, he suggested that the use of pagers by medical professionals was an inherently beneficial use and a special reason to permit the facility. Negative impacts were said to be limited to esthetic or visual. The facility would not impact traffic, noise considerations and air quality.
This witness also indicated that removal of these facilities would probably mean that certain pagers would not work effectively in the area. He acknowledged that the new tower would be for Northeast's financial gain and assumed that other suitable sites for the network existed in the area.
There was also testimony from an expert regarding radio wave transmission environmental safety. A geotechnical engineer testified as to the ability of soil and rock to support the tower. A member of the public stated that he halted his own plans for construction on his property when he learned of the tower project because he did not intend to live right under a telecommunications tower.
In denying Northeast's application by a unanimous 7-0 vote, the Board made various findings in its resolution: The site was located in a Residential A Zone, and bordered by residences to the north and south and by a road to the rear; the proposed tower would be directly behind an existing garage, whereas the current tower was in the middle of the rear yard; the tower's elevation would be eight feet higher than the existing monopole tower which was an illegal use under the town's zoning ordinances and did not constitute a preexisting nonconforming use. Northeast was a for-profit corporation engaged in a commercial business enterprise and unregulated by the government as to its rates, charges, uses or return on investment. The resolution noted that Northeast acquired title to the property in 1993 knowing that it was zoned for residential use; neither it nor its predecessor-in-title ever obtained any variances to use the property for commercial purposes, place transmitters or receivers or erect a monopole antenna, and had not acquired the right to maintain and mix commercial and residential use for the property and buildings. The property was noted to be the subject of a violation notice and Northeast was aware when it acquired the property that it lacked necessary approvals and was in violation of zoning ordinances. Moreover, Northeast was "not a single user service," but was "in competition with many other like providers of this commercial service" within the immediate vicinity. Northeast admitted that appropriately zoned sites were available within the borough for such uses and Northeast owned additional sites to operate the service; the majority of users were commercial, and none were governmental or public safety entities.
The Board concluded that Northeast had not demonstrated "exclusive public safety or public need" for the tower, nor that failure to approve the site would hinder public safety or governmental use for *195 that type of facility in the area. It concluded that Northeast's tower was not an inherently beneficial use, but merely a commercial benefit for a commercial user. It also concluded that Northeast failed to residential zone would not impair the intent of the zoning scheme and adversely affect the surrounding neighborhood, real estate values and public safety and health. The resolution also indicated that Northeast had failed to demonstrate to the Board's satisfaction that construction of the project conforms "with federal and state standards for electromagnetic radiation." The Board found that locating the proposed tower in a Residential A district was "particularly inappropriate" and that Northeast had not demonstrated special reasons for granting the application; the grant of the application would "be substantially detrimental to the public good" and "substantially impair the intent and purpose of the Zoning plan." Finally, Northeast's proofs "demonstrate[d] the unsuitability of the site, the unsuitability of the design, the noncompliance with the Zoning Ordinance and conflicts with the master plan."

I.
The Board argues that the trial judge erroneously substituted his judgment for that of the Zoning Board, failed to accord the Board's decision the presumption of validity to which it was entitled and to recognize that the Board's decision was not arbitrary, capricious or unreasonable. The Board also points out that the judge erred because the borough's ordinance for the Residential A Zone does not permit the tower's use as a commercial venture and Northeast failed to sustain its burden to prove that special reasons existed to support the variance or that it could be granted without substantial detriment to the public good or substantially impairing the intent and purpose of the borough zoning plan.
It is clear that the borough's ordinance, which covers "buildings or premises" and "other structures," does not permit the proposed or existing tower in the Residential A Zone. Nor does the tower fit the definition of an accessory use under the ordinance or a state statute. See Wyzykowski v. Rizas, 132 N.J. 509, 518-519, 626 A.2d 406 (1993). This is particularly so where there is a residential home on the property which complies with the zoning, but for the commercial use by the tower. The tower supports a separate and primary use and would be supported by an equipment structure.
Under N.J.S.A. 40:55D-70(d), the Board can grant a variance for special reasons to permit, among other things, a use or principal structure in a district in which such uses or structures are restricted, an expansion of a nonconforming use, or a height of a principal structure that "exceeds by 10 feet or 10% the maximum height permitted in the district for a principal structure."
Northeast's zoning application in part requested a variance to expand an existing nonconforming use. However, there were no arguments presented that the existing tower was a permitted nonconforming use. Hence, the issue is whether Northeast was entitled to a variance to locate or continue its tower in a district where such uses and structures were not permitted.
There is a presumption that a municipality's zoning regulations are reasonable. Moriarty v. Pozner, 21 N.J. 199, 210, 121 A.2d 527 (1956). Hence, variances should "be granted only sparingly and with great caution since they tend to impair sound zoning." Kohl v. Mayor and Council of the Bor. of Fair Lawn, 50 N.J. 268, 275, 234 A.2d 385 (1967). Furthermore, a variance will not be granted if it advances only the purposes of the property owner. Menlo Park Plaza v. Planning Bd. of the Twp. of Woodbridge, 316 N.J.Super. 451, 461, 720 A.2d 626 (App. Div.1998), certif. denied, 160 N.J. 88, 733 A.2d 493 (1999).
*196 Under N.J.S.A. 40:55D-70(d),[2] an applicant for a variance must satisfy both the "positive" criteria, or "special reasons" for the grant of the variance, and the "negative" criteria, establishing that the variance "can be granted without substantial detriment to the public good" and that it "will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." Sica v. Board of Adj. of Twp. of Wall, 127 N.J. 152, 156, 603 A.2d 30 (1992) (quoting the applicable version of N.J.S.A. 40:55D-70(d)). "Generally, to satisfy the positive criteria, an applicant must prove that `the use promotes the general welfare because the proposed site is particularly suitable for the proposed use.'" Smart SMR v. Fair Lawn Bd. of Adj., 152 N.J. 309, 323, 704 A.2d 1271 (1998) (quoting Medici v. BPR Co., 107 N.J. 1, 4, 526 A.2d 109 (1987)). The negative criteria require proof that the "variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." Ibid.
An "inherently beneficial" use, such as a school or hospital, by its nature can provide special reasons to grant the variance, thus presumptively satisfying the positive criteria. Smart SMR, supra (152 N.J. at 323, 704 A.2d 1271); Kohl, supra (50 N.J. at 279, 234 A.2d 385). The negative criteria nonetheless must be satisfied. Ibid.; N.J.S.A. 40:55D-70(d).
For proposed uses not inherently beneficial "there must be a finding that the general welfare is served because the use is peculiarly fitted to the particular location for which the variance is sought." Kohl, supra (50 N.J. at 279, 234 A.2d 385). An enhanced quality of proof is required in such cases, as well as clear and specific findings by the board of adjustment that a use variance "is not inconsistent with the intent and purpose of the master plan and zoning ordinance." Medici, supra (107 N.J. at 4, 526 A.2d 109). The proponent of an inherently beneficial use need not meet this enhanced quality of proof for negative criteria. Smart SMR, supra (152 N.J. at 323, 704 A.2d 1271).
Northeast asserted in its 1993 application that its tower was an inherently beneficial use. Some decisions issued prior to plaintiff's application and the hearings supported such a contention. See, e.g., New Brunswick Cellular Tel. Co. v. Borough of South Plainfield Bd. of Adj., 305 N.J.Super. 151, 166-167, 701 A.2d 1281 (App.Div.1997)[3] (proposed 90-foot steel monopole for cellular antennae was inherently beneficial in a manufacturing and industrial zone); Nynex Mobile Commun. Co. v. Hazlet Tp. Zoning Bd. of Adj., 276 N.J.Super. 598, 609, 648 A.2d 724 (App. Div.1994) (cellular transmission antenna to be annexed to 130-foot water tower in a residential zone constituted inherently beneficial use); New Brunswick Cellular Tel. Co. v. Township of Edison Zoning Bd. of Adj., 300 N.J.Super. 456, 469-471, 693 A.2d 180 (Law Div.1997) (proposed 80-foot monopole for cellular antennae in a light industrial zone was inherently beneficial); Kingwood Twp. Vol. Fire Co. v. Board of Adj., 272 N.J.Super. 498, 503-506, 509, 640 A.2d 356 (Law Div.1993) (197-foot cellular telecommunications tower as expansion of nonconforming use in "largely undeveloped and uninhabited area" in a residential zone was inherently beneficial use).
*197 However, in 1998 and subsequent to the Board's denial of Northeast's application, but before the trial judge's decision, Smart SMR v. Fair Lawn Bd. of Adj., supra (152 N.J. at 328-329, 704 A.2d 1271) explicitly rejected the notion that construction of a communications tower constituted an inherently beneficial use. The Court did hold that an FCC license could satisfy the first requirement of the positive criteria and establish that the facility serves the general public welfare. Id. at 336, 704 A.2d 1271. Thereafter, the Court in AWACS, Inc. v. Clemonton Zoning Bd. of Adj., 160 N.J. 21, 733 A.2d 453 (1999), emphasized that an applicant for a variance to construct a communications tower nonetheless must satisfy the remaining requirements for obtaining a variance, demonstrating that (1) the chosen site is particularly suited for the proposed use, (2) the application may be granted without violating the negative criteria relating to the intent and purpose of the master plan, and (3) a weighing of the positive and negative criteria shows that granting the variance will not result in a substantial detriment to the public good. The Court also emphasized that, while not required, it is a "better practice" for applicants to present expert testimony concerning the tower's potential impact on the master plan or zoning ordinance. Id. at 25, 733 A.2d 453. Similarly, establishing proof of adverse effects on adjacent property values and the zoning plan "generally" will require expert testimony, rather than mere allegations. Smart SMR, supra (152 N.J. at 336, 704 A.2d 1271).
In Smart SMR the Court found that the applicant had met the positive criteria and established that the site in Fair Lawn's industrial zone was particularly suited for the 140-foot tower because the site was zoned for industrial use, was centrally located in the applicant's system, and it already accommodated a 90-foot monopole. Id. at 332, 704 A.2d 1271. The site was bounded on three sides by commercial and industrial uses and single-family homes abutted the remaining side of the property. Id. at 316-317, 704 A.2d 1271. Construction of the new tower would eliminate the need for two towers because the owner of the 90-foot tower was willing to co-locate its antennae on the new tower. Id. at 320, 704 A.2d 1271. The system was "an improvement on cellular telephone systems" because it provided clearer signals and enhanced protection against eavesdropping. Id. at 316, 704 A.2d 1271. Furthermore, the site was said to be "essential" for the system to operate fully and had been selected only after the applicant first considered and rejected other locations. Id. at 318, 704 A.2d 1271.
In a series of cases decided after Smart SMR, the non-inherently beneficial standard has been applied on review despite the fact that, as here, the zoning boards initially had decided the cases assuming the inherently beneficial standard. In each case the board had denied the variance. AWACS, Inc., supra (160 N.J. at 23, 733 A.2d 453); New Brunswick Cellular Tel. Co., supra (160 N.J. at 5, 733 A.2d 442);[4]New York SMS A Ltd. Partnership v. Board of Adj. of Middletown Tp., 324 N.J.Super. 166, 168, 734 A.2d 826 (App. Div.1999); New York SMSA Ltd. Partnership v. Board of Adj. of Bernards Tp., 324 N.J.Super. 149, 154, 734 A.2d 817 (App. Div.1999).
In AWACS, Inc., supra (160 N.J. at 23, 733 A.2d 453), Comcast applied for a variance to construct a 100-foot monopole in a commercially zoned area of Clementon near a residential zone. Tenants of a nearby apartment complex and area business owners objected for primarily esthetic reasons. Id. at 24, 733 A.2d 453. The Court found that Comcast had satisfied the positive criteria because its FCC license *198 demonstrated the use would serve the public welfare; it had presented uncontroverted testimony establishing the need for additional cellular telephone service in the area; and the location of the site in a commercial zone, adjoining a major highway and well-situated to deliver the service, established the site as particularly suited for a telecommunications facility. Id. at 25, 733 A.2d 453. Nonetheless, the Court remanded the matter to the Board because Comcast had presented no expert testimony on the effect on the master plan or zoning ordinance of granting the variance. Ibid.
In New Brunswick Cellular Tel. Co., supra (160 N.J. at 10-12, 733 A.2d 442), Comcast sought a variance to construct a 90-foot monopole in the least restrictive zone in South Plainfield, where residential uses were expressly prohibited. Several nonconforming residences were located in the zone, however, and those homeowners objected to construction of the tower. Comcast claimed it could not serve its customers from existing area facilities, a contention that the objectors disputed. Id. at 12-13, 733 A.2d 442. The Court found that Comcast had satisfied the positive criteria by establishing that it required the monopole to meet public demand for telecommunications in the area, and that the site's location in an industrial zone between I-287 and a railroad was particularly suitable. Id. at 14-15, 733 A.2d 442.
Comcast also had satisfied the negative criteria because uncontradicted evidence established that the structure would generate no noise or traffic or impose additional burdens on municipal services. Id. at 15, 733 A.2d 442. Comcast had presented testimony from a land use planner that the tower's location in an industrial zone would not significantly impact development of the zone. Id. at 13, 733 A.2d 442. South Plainfield had provided no zoning for telecommunications facilities, nor had it identified appropriate sites for their location. Id. at 15, 733 A.2d 442. The Court observed that "[a]n abiding concern with telecommunications facilities ... is their height," but it concluded that the esthetic impact of the 90-foot monopole would be minimal in light of its location in an industrial zone. Ibid. It remarked, however, that "a comparable structure in a residential zone could impose a more substantial adverse impact." Id. at 15-16, 733 A.2d 442.
In New York SMSA Ltd. Partnership v. Board of Adj. of Middletown Tp., supra (324 N.J.Super. at 172-177, 734 A.2d 826), decided after both Smart SMR, AWACS, and New Brunswick Cellular Tel. Co., we applied the principles therein to an application to construct a 125-foot tower in an area that abutted the Garden State Parkway right-of-way, zoned single-family residential with a minimum lot size of one acre. A township ordinance permitted such towers in non-residential zones if located 200 feet from a residential zone and the applicant submitted evidence that construction of the tower was necessary for the efficient and effective provision of services and addressed whether existing towers or structures could be utilized as alternate sites. Id. at 169, 734 A.2d 826. The board was justified in denying the variance in part because the applicant had failed to comply with the procedural and information requirements of the ordinance. We concluded "that the grant of this variance, in a zone recently singled out by the municipality as inappropriate for the proposed use, does not satisfy the second prong of the negative criteria, that the variance will not `substantially impair the intent and purpose of the zone plan and zoning ordinance'." Id. at 174, 734 A.2d 826 (quoting N.J.S.A. 40:55D-70(d)).
In New York SMSA Ltd. Partnership v. Board of Adj. of Bernards Tp., supra (324 N.J.Super. at 153-154, 734 A.2d 817), also decided after Smart SMR, AWACS, and New Brunswick Cellular Tel. Co., we again upheld denial of a variance to construct a communication tower. The applicant sought to locate the tower on the grounds of a school for emotionally disturbed *199 boys in a "public purpose" zone that permitted public or institutional uses such as hospitals, recreational or educational facilities, but no commercial or industrial uses. The nearest residences were 600 feet away, and a townhouse development was 1,300 feet from the proposed site, but no trees or vegetation would effectively screen the tower from the townhomes' view. Id. at 155, 734 A.2d 817. We held that the record supported the board's determination that the applicant had failed to meet its burden with respect to either the positive or negative criteria. Id. at 160-161, 734 A.2d 817.
As to the negative criteria, we stated that we need not address the board's conclusion that the public interest in perfecting cellular telephone service for the area was "not very compelling." Id. at 161-162, 734 A.2d 817. We found that the "existence of the coverage gap [claimed by the applicant] and the desirability of filling it is clear." Id. at 156, 734 A.2d 817. The board's finding that the tower would be an intrusive presence in the neighborhood could not be disputed, and the applicant had failed to present any evidence concerning the possible danger and potential threat to the safety of the school's students. Id. at 164, 734 A.2d 817.
Applying Smart SMR and its progeny, and comparing the circumstances in recent decisions, indicates that the judge erred in reversing the Board's decision denying Northeast's application. First, the judge's analysis erroneously failed to accord any deference to the Board's determination. The decision to grant a variance has been entrusted to the sound discretion of the municipal zoning board hearing the application, guided by the statutory criteria. Kaufmann v. Planning Bd. for Warren Tp., 110 N.J. 551, 558, 542 A.2d 457 (1988). It is not the role of the reviewing court to determine if the decision was wise or unwise. Ibid. Moreover, "[a]ctions of a board of adjustment are presumed to be valid and the party attacking such action has the burden of proving otherwise." New York SMSA Ltd. Partnership v. Board of Adj. of Bernards Tp., supra (324 N.J.Super. at 163-164, 734 A.2d 817). The Court determined in Kramer v. Board of Adj., Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965), that zoning boards
because of their peculiar knowledge of local conditions must be allowed wide latitude in the exercise of delegated discretion. Courts cannot substitute an independent judgment for that of the boards in areas of factual disputes; neither will they exercise anew the original jurisdiction of such boards or trespass on their administrative work. So long as the power exists to do the act complained of and there is substantial evidence to support it, the judicial branch of the government cannot interfere. A local zoning determination will be set aside only when it is arbitrary, capricious or unreasonable. Even when doubt is entertained as to the wisdom of the action, or as to some part of it, there can be no judicial declaration of invalidity in the absence of clear abuse of discretion by the public agencies involved. Where the board's decision is reasonably supported by the record, it will be sustained. Id. at 285, 212 A.2d 153; New York SMSA Ltd. Partnership v. Board of Adj. of Bernards Tp., supra (324 N.J.Super. at 163-164, 734 A.2d 817).
Moreover, greater deference is accorded to denial of a variance than to a grant. Funeral Home Mgmt., Inc. v. Basralian, 319 N.J.Super. 200, 208, 725 A.2d 64 (App.Div.1999). Where a zoning board has denied a variance, the proponent has the "heavy burden" of proving that the evidence before the board "was so overwhelmingly in favor of the applicant that the board's action can be said to be arbitrary, capricious or unreasonable." Medical Realty Assoc. v. Board of Adj. of Summit, 228 N.J.Super. 226, 233, 549 A.2d 469 (App.Div.1988). This greater deference arises in part from the recognition that only exceptional cases warrant use variances *200 because this state's legislative policy strongly favors "land use planning by ordinance rather than by variance." See Funeral Home Mgmt. Inc. v. Basralian, supra (319 N.J.Super. at 207, 725 A.2d 64) (quoting Elco v. R.C. Maxwell Co., 292 N.J.Super. 118, 126, 678 A.2d 323 (App. Div.1996)).[5]
This case came before the trial judge as a result of an action in lieu of prerogative writs, and not from an appeal to a municipal governing body. However, the trial judge's comments during argument and his analysis indicate that he conducted a de novo review such as would be done by a municipal governing body under N.J.S.A. 40:55D-17. At the conclusion of oral argument the judge inappropriately, considering the standard of review, requested that the attorney for each party provide "findings of fact and appropriate conclusions for my consideration," even though the Board's findings and conclusions already had been memorialized and were before the court for review.[6]
The judge's written opinion not only contained no analysis of whether the Board's conclusions were supported by the record but also did not attempt to relate the facts as found by the Board or to establish why those facts were unsupported by the record. Instead, the judge issued his own findings and conclusions, which he supported by testimony before the Board. For example, regarding testimony of Northeast's planner, the judge stated: "At the May 22, 1995 hearing, plaintiff's licensed planner, Jeffrey Stiles, offered uncontroverted testimony supporting the conclusion that plaintiff's application meets the positive criteria required of such applications under N.J.S.A. 40:55D-70(d) because special reasons exist by virtue of enhanced regional business and emergency communications capabilities." The judge then set forth the portions of Stiles's testimony that supported such a conclusion. The judge continued, finding "that the record before the Board supports a finding that the requested use variance may be granted without substantial detriment to the public good" and listing the reasons for its conclusion.
The judge analyzed each of the issues before the Board in the same manner, stating a legal conclusion and then citing supporting testimony from the record. Consequently, he determined that: "the record amply demonstrates that the subject property is particularly well-suited for the proposed use," citing a list of facts the court accepted as true: "[p]laintiff, through uncontroverted testimony, has established that the proposed use serves the general welfare" because the antennae currently serve "numerous public, private, medical, health care, emergency and charitable entities which require such services" and were licensed by the FCC; and "plaintiff has met the `enhanced quality of proof' " standard required under Medici, [supra,] which necessitates the reconciliation of the proposed use to the zoning plan and the zoning ordinance of the municipality because West Paterson, like other municipalities, had not zoned for communications towers. The court specifically rejected the Board's conclusion that Northeast had failed to demonstrate conformity with radiation emission standards and made no reference to any of the *201 Board's other findings or conclusions, merely reciting his own findings.
Despite the judge's opinion setting forth the correct law concerning the deferential standard for review of a municipality's decision denying Northeast's request for a use variance, the judge's analysis in fact failed to adhere to that standard. Except for the Board's findings concerning radiation emissions, the judge's opinion did not discuss the Board's findings, declaring instead that the "record below reveals that it is lacking in any credible evidence or supporting testimony upon which the Board's findings of fact and conclusions of law as embodied in the resolution of December 18, 1995 can be supported." The trial judge gave no deference to the Board's decision, let alone the greater degree of deference ordinarily accorded a zoning board's denial of a variance.
We are satisfied from our review of the record that the Board's decision was supported by the record and is consistent with the conclusions expressed by the courts in most recent case law. This is so despite the fact that the objectors presented virtually no expert testimony and that the Board's analysis was not as fulsome as possible. Assuming Northeast possessed an FCC license, and thus served the general public welfare, it made no showing of how the tower would improve communications in the area. In Pierce Estates Corp. v. Bridgewater Tp. Zoning Bd. of Adj., 303 N.J.Super. 507, 517, 697 A.2d 195 (App. Div.1997), decided prior to Smart SMR, we held that an applicant relying on the inherently beneficial nature of a communications tower to improve telecommunications must prove that its tower actually would have that effect. The plaintiff there, who was not in the telecommunications business, had asserted that its tower would "improve communications," but was unable to show that the tower would be used to fill identified gaps in coverage, improve mobile phone communications, or provide real emergency benefits. Ibid.
In this case, Northeast presented testimony that one of Tel-Air's thousands of paging accounts was a hospital and "many doctors, dentists, and veterinarians," used pagers serviced from the tower. But Northeast presented no testimony whatsoever that the absence of this particular tower would impede those doctors' ability to obtain paging services or even that this tower formed an important link in providing paging coverage for the area. Furthermore, Stites stated that he had no plans to use the tower for mobile phone communications and thus the tower provided beeper services only.
Northeast made no attempt to discover if the tower could be located on other sites in non-residentially-zoned areas of West Paterson or neighboring communities. Plaintiff argued throughout the hearings that the topography of this site made it particularly suitable for a communications tower, and the trial judge accepted that argument as proof that Northeast had met the special reasons criteria. The concept expressed in Kohl as to the peculiar suitability of the location requires, however, that the use "fits well with the surrounding area...." Funeral Home Mgmt. Inc. v. Basralian, supra (319 N.J.Super. at 209, 725 A.2d 64). Northeast's arguments and evidence, and the trial judge's analysis, incorrectly focussed on the suitability of the location solely from the point of view of the applicant, not the municipality. It is not disputed that the location and height of the ridge afforded Northeast an ideal location for its tower. That showing alone, however, is insufficient to establish the particular suitability of the site.
The Board's findings that the site was "particularly inappropriate" because it was in an entirely residential zone and Northeast had conceded that its service could be located either on other sites it owned or on other sites in the Borough that were within commercial zones already appropriately zoned is supported by the record. Although Northeast presented a *202 series of experts, each of those experts presented opinions that were undermined by their lack of knowledge about the area and the site, or, in Stiles's case, that the Board could find inherently incredible. A board "has the choice of accepting or rejecting the testimony of witnesses. Where reasonably made, such choice is conclusive on appeal." Kramer v. Sea Girt Bd. of Adj., supra (45 N.J. at 288, 212 A.2d 153) (quoting Reinauer Realty Corp. v. Nucera, 59 N.J.Super. 189, 201, 157 A.2d 524 (App. Div.), certif. denied, 32 N.J. 347, 160 A.2d 845 (1960)); see also Hawrylo v. Harding Tp. Bd. of Adj., 249 N.J.Super. 568, 579, 592 A.2d 1236 (App.Div.1991); Allen v. Hopewell Tp. Zoning Bd., 227 N.J.Super. 574, 581, 548 A.2d 220 (App.Div.), certif. denied, 113 N.J. 655, 552 A.2d 177 (1988).
In this case, Stiles's testimony that the use was inherently beneficial was negated by our Supreme Court's decision in Smart SMR. His additional testimony that no distinction existed between this privately-owned and unregulated communications tower and a public utility has no basis in law. His concept that the tower stimulated commerce and thus satisfied the positive criteria is antithetical to the very idea of zoning.
Northeast's structural engineer had not visited the site; its geotechnical engineer had done no borings and had not been informed of the loading conditions for the tower. Northeast's real estate appraiser conducted no sales studies of the neighborhood and spoke with only one individual real estate agent, whose credentials he did not know, and one real estate appraiser. In the studies he cited based on other towns, the towers, without exception, were located hundreds of feet from the nearest residence. The Board could reasonably find that his testimony concerning the impact of this tower was inherently incredible. For example, he asserted that neither the price nor marketability of the home on the subject property would be affected by the existence of a 95-foot tower on a 10-foot concrete platform next to the garage, and also that this tower could simply be removed if the new owners did not like it, but gave no estimate of the cost of doing so. Removing a 10-foot concrete platform and 95-foot steel structure would not appear to be simple or inexpensive. As with any other benefit or detriment, the cost of removing the tower would have to be factored into the price of the home. The fact that in what was described as a highly desirable, well-maintained, residential area, the home now was owned by a corporation and occupied by tenants, rather than the property owner, also supported the Board's conclusion that the character of the neighborhood would be affected by the commercial use of the property.
The objectors in this case presented no real estate expert. Although the Court observed in Smart SMR, supra (152 N.J. at 336, 704 A.2d 1271), that a negative effect on real estate prices generally would not be presumed and should be proven by experts, it is reasonable to believe the Court was assuming that, in most cases, the tower would actually be constructed in an area zoned for commercial, industrial, or mixed uses, perhaps with residences nearby. The distinguishing factor here is Northeast's attempt to justify locating the 95-foot tower in an exclusively residential zone where it would be adjacent to the actual home and fall short of meeting setback requirements established for much lower buildings, let alone for structures almost 100 feet tall. Even in the absence of expert testimony, the record supported the Board's conclusion that existence of such a tower would change the character of the area, adversely affect real estate prices, and impair the intent of the zoning scheme.

II.
The Board argues that, contrary to the trial judge's conclusion, its decision did not violate the Telecommunications Act of 1996, Pub.L. No. 104-104, 110 Stat. 56 (codified principally at 47 U.S.C.A. §§ 151-614 (1996)) (TCA or Act), because the intent *203 and effect of its decision was to require that communications towers be located in a more suitable zone within the Borough, not to ban them altogether.
The trial judge concluded that "the Board's denial of plaintiff's application violates the Telecommunications Act of 1996" because the Act forbids state and local governments from regulating the placement of wireless facilities in such a manner as to prohibit the provision of personal wireless services. He did not explain how the Board's decision would have had such an effect. Northeast argues that the Board violated the Act because its decision was not based on substantial evidence in the record.
The TCA does limit the "regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality": It provides that State or local government "(I) shall not unreasonably discriminate among providers of functionally equivalent services; and (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C.A. § 332(c)(7)(B)(i). In addition, the municipality must act on requests for authorization to construct or modify such facilities "within a reasonable time," 47 U.S.C.A. § 332(c)(7)(B)(ii), and may not regulate such facilities on the basis of the environmental effects of the emitted radio transmissions, as long as the transmissions comply with federal regulations, 47 U.S.C.A. § 332(c)(7)(B)(iv). Denials of such requests must be in writing and "supported by substantial evidence contained in a written record." 47 U.S.C.A. § 332(c)(7)(B)(iii). Finally, the Act provides that any person adversely affected by the decision of a state or local government regarding personal wireless services may commence an action in any court, state or federal. 47 U.S.C.A. § 332(c)(7)(B)(v); Smart SMR, supra (152 N.J. at 326, 704 A.2d 1271).
The Board's decision here did not violate the TCA. First, Northeast did not file its complaint under the TCA. Second, as observed in Smart SMR, supra (152 N.J. at 326, 704 A.2d 1271), the Act parallels restrictions already imposed by New Jersey's Municipal Land Use Law, N.J.S.A. 40:55D-1 to -136, and the New Jersey Radiation Protection Act, N.J.S.A. 26:2D-1 to -23.4, requiring that the municipal land use agency act within a reasonable time, that it memorialize its decision in writing, that its decision be supported by sufficient credible evidence, and that localities may not regulate radiation emissions as long as the emissions comply with state regulations.
Finally, no evidence in the record indicated that failure to permit the construction or continued use of plaintiff's communications tower would have the effect of prohibiting coverage outright.
In addition, the TCA imposes no obligation that a board accept all expert testimony presented. New York SMSA Ltd. Partnership v. Board of Adj. of Middletown Tp., supra (324 N.J.Super. at 175-177, 734 A.2d 826). The TCA is inapplicable here where there is no evidence that the Board's decision effectively prohibited access to the wireless use serviced by Northeast's tower. The Board's decision acted as "neither a moratorium nor a blanket prohibition," but was "just one decision in a municipality that permits wireless facilities in other locations." Id. at 176, 734 A.2d 826.
The judgment of the Law Division is reversed and the determination of the Zoning Board of Adjustment of the Borough of West Paterson is reinstated.
NOTES
[1] 47 U.S.C.A. §§151 etseq.
[2] The statute was amended in 1997 to clarify that even proponents of an inherently beneficial use must show that the requested relief could be granted without substantial detriment or impairment of the zoning plan. L. 1997, c. 145, § 1.
[3] This case was appealed as of right and remanded by the Supreme Court for reconsideration in light of Smart SMR, supra. After remand we affirmed, New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield Bd. of Adj., 314 N.J.Super. 102, 104, 714 A.2d 315 (App. Div.1998), holding that denial of the variance was not arbitrary and capricious. Plaintiffs again appealed and the Supreme Court reversed. New Brunswick Cellular Tel. Co. d/b/a Comcast Cellular One v. Borough of S. Plainfield Bd. of Adj., 160 N.J. 1, 733 A.2d 442 (1999). This case is discussed infra.
[4] In New Brunswick Cellular Tel. Co., supra (160 N.J. at 19-20, 733 A.2d 442), Justice O'Hern would have remanded the matter to the board because both the board and the Law Division judge had decided the case under the inherently beneficial standard. That is not the case here.
[5] This restricted role of the trial court in such matters is in contrast to that of a municipal governing body hearing a challenge to the action of a board of adjustment as when, for example, such appeal is taken in instances authorized by N.J.S.A. 40:55D-17. Evesham Tp. Zoning Bd. of Adj. v. Evesham Tp. Council, 86 N.J. 295, 300-302, 430 A.2d 922 (1981). The municipal governing body hearing the appeal reviews the record de novo, and then makes its own findings of fact and conclusions of law. Id. at 301-302, 430 A.2d 922. Thereafter, the reviewing court is limited to determining if the governing body's findings were supported by the record and whether the decision was arbitrary, capricious, or unreasonable. Id. at 302, 430 A.2d 922.
[6] It is unclear whether the judge received the requested proposed findings since they are not in the record.