**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0111-15T2

SCHOWL HEDVAT AND
SIMA HEDVAT,

    Plaintiffs-Appellants,

v.

TENAFLY PLANNING BOARD AND
BOROUGH OF TENAFLY,

    Defendants-Respondents,

and

PASSAIC VALLEY TITLE SERVICE,
TICOR TITLE INSURANCE COMPANY,
CHICAGO TITLE INSURANCE COMPANY,
ROBERT J. MUELLER, MICHAEL HUBSCHMAN,
HUBSCHMAN ENGINEERING, PA., ERIC
MARGOLIS and KAREN PATRUSKY,

    Defendants.

_____

Argued telephonically February 14, 2017 —
Decided August 9, 2017

Before Judges Simonelli, Carroll and Gooden
Brown.

On appeal from the Superior Court of New
Jersey, Law Division, Bergen County, Docket
No. L-0993-12.

Carmine R. Alampi argued the cause for appellants (Alampi & DeMarrais, attorneys; Thomas A. Lodato, on the briefs).

Jeffrey A. Zenn argued the cause for respondent Tenafly Planning Board (Cullen and Dykman, LLP, attorneys; Mr. Zenn, on the brief).

Respondent Borough of Tenafly has not filed a brief.

PER CURIAM

Plaintiffs Schowl and Sima Hedvat (collectively, plaintiff) appeal from the October 22, 2012 judgment, which affirmed the decision of respondent Tenafly Planning Board (Board) to deny plaintiff's application for minor subdivision approval. We affirm.

We derive the following facts from the record. Plaintiff owns property on Elkwood Terrace in Tenafly known as Lot 3, Block 2103 (the property). The property is a large rectangular lot measuring 33,709 square feet, and contains a single-family home that fronts Elkwood Terrace with access to Elkwood Terrace via a driveway. There presently is a stone or gravel driveway in the rear of the property that fronts Mayflower Drive. Mayflower Drive is a municipal right-of-way; it is steep and has a series of curves with a reverse curve in the rear of the property.

The property is located in the R-10 zone district, but the properties across the street and adjacent are located in the R-40

zone district.  The minimum lot size in the R-10 zone is 10,625 square feet, and the minimum lot size in the R-40 zone is 40,000 square feet.  The Tenafly Land Development Regulations (LDR) require a minimum 50-foot lot width at the street line (frontage) for properties in the R-10 zone, and a minimum 90-foot frontage in the R-40 zone.  LDR Section 35-722.1 contains the following design standard for a subdivision:

> The subdivider shall observe the requirements and principles of land subdivision in the design of each subdivision or portion thereof, as set forth in this Article.  The "New Jersey Residential Site Improvement Standards" [(RSIS) N.J.A.C. 5:21-1 to -8.1] are hereby adopted in their entirety.  When such State standards conflict with those set forth in this ordinance, the RSIS shall apply.

Regarding safe stopping sight distance and safe intersection sight distance standards, RSIS requires adherence to the American Association of State Highway and Transportation Officials (AASHTO) standards.  N.J.A.C. 5:21-4.19(b).

In 2004, plaintiff filed an application to subdivide the property into two lots: proposed Lot 3.01 would measure approximately 18,548 square feet; and proposed Lot 3.02 would measure approximately 15,159 square feet (the 2004 application). A survey prepared by plaintiff's expert engineer and land surveyor, Hubschman Engineering, P.A., showed the property ended at the

right-of-way line of Mayflower Drive, creating a frontage of only 41.68 feet at the street line of Mayflower Drive. This resulted in a deficiency of approximately nine feet or approximately seventeen percent of the minimum required lot frontage. Thus, plaintiff sought a lot width variance. Plaintiff also sought a variance for encroachment into steep slope areas in excess of twenty-five percent for the rear of proposed Lot 3.02. After several hearings, plaintiff withdrew the application.

In June 2007, plaintiff applied for a permit to construct a swimming pool and patio on the property and a driveway in the rear of the property that would provide ingress and egress from Mayflower Drive. Contrary to the 2004 application, plaintiff's plan for the permit showed no steep slopes in excess of twenty-five percent in the rear of the property near the location of the driveway, indicating that plaintiff had leveled the backyard. Although a permit was issued for all of the work (the 2007 permit), plaintiff only constructed the driveway at the rear of the property.

In 2010, plaintiff filed a new application to subdivide the property into two lots: proposed Lot 3.01 would measure approximately 17,625 square feet, contain the existing single-family home, and front Elkwood Terrace; and proposed Lot 3.02 would measure approximately 16,084 square feet and would front

Mayflower Drive (the 2010 application). Plaintiff asserted that the subdivision required no variance because the frontage for proposed Lot 3.02 at the street line of Mayflower Drive was approximately 66.69 feet, not 41.68 feet. Nevertheless, plaintiff included a request for a variance, if necessary.

Plaintiff had retained a new expert engineer and land surveyor, Steven Koestner, who prepared a new survey in November 2009. Koestner testified that the 66.69-foot frontage at the street line of Mayflower Drive differed from the 41.68-foot frontage in the Hubschman survey because he had located a stone monument in the northwest corner of the property at the intersection of Elkwood Terrace and Bliss Avenue. Koestner explained that plaintiff's deed had a call for the property and when he followed the call from the newly discovered stone monument, he found the property line extended approximately 2.7 feet into the right-of-way of Mayflower Drive, which produced a frontage at the street line of Mayflower Drive of approximately 66.69 feet.

A neighboring objector's expert surveyor and planner, James Sens, testified that Mayflower Drive is equivalent to a monument call; however, a call to a monument only controls in the event of an inconsistency or ambiguity with a metes and bounds description in a deed or geometry. Sens explained that even if Koestner's description of the property starting at a stone monument and going

A-0111-15T2

366 feet was correct, the metes and bounds description in plaintiff's deed specifically recited that the property extended "to a point on the westerly street line of Mayflower Drive" and then went up to and along Mayflower Drive on its second course, not into Mayflower Drive. Sens opined that "the call in the deed is . . . clear, and the call is to Mayflower Drive, so . . . the terminus of that course is Mayflower Drive." Accordingly, Sens testified that under the priority of calls among surveyors, the property only went to the right-of-way line of Mayflower Drive because Mayflower drive acts as a monument. Sens concluded that the frontage along Mayflower Drive was 41.68 feet, thus necessitating a variance from the minimum required street frontage.

Sens also testified that no property owner would have an expectation that their property would extend into a municipal right-of-way. He emphasized that plaintiff's deed referenced a survey showing the property line ended at the right-of-way of Mayflower Drive, and the description in plaintiff's deed and the deed of a predecessor in title did not start at a stone monument or even reference a stone monument. Thus, Sens concluded that the property's easterly property line extended up to but not into the right-of-way of Mayflower Drive.

A-0111-15T2

The Board's expert engineer and surveyor, David Hals, agreed with Sens that there is a priority of calls and plaintiff's deed, regardless of how the lot was created in the past, only contemplated that the property line extended to and not into the right-of-way of Mayflower Drive. Hals advised the Board that it need not determine the lot's overall size or consider title determinations; rather, the Board had to determine where the easterly side of the property ended.

Plaintiff's transportation and planning expert, Hal Simoff, addressed the issue of safe ingress and egress from proposed Lot 3.02 along Mayflower Drive. Simoff reviewed the AASHTO standards to determine adequate sight distances. Simoff testified that although the speed limit on Mayflower Drive was twenty-five-miles-per-hour, the design speed of the curve on Mayflower Drive as per AASHTO design standards was twenty miles-per-hour. Based on that design speed, Simoff determined that the required stopping distance for vehicles exiting from the property onto Mayflower Drive was 109 feet as mandated by AASHTO. Simoff testified that the site distance from the proposed driveway was approximately 150 feet, subject to removal of the vegetation/landscaping within the right-of-way in front of the objector's adjacent lot on Mayflower Drive that blocked the view of the driveway. Simoff also testified

that Mayflower Drive should be signed with a speed limit of twenty miles-per-hour.

The objector testified that he removed the vegetation/landscaping within the municipal right-of-way to the satisfaction of the Borough's Director of Public Works.

The objector's expert traffic engineer, Henry Ney, testified that when reviewing the proposed driveway location, sight distance is the primary concern from a safety and traffic perspective. He testified that the RSIS governed because this was a subdivision application, and the RSIS relies on the same AASHTO standards that Simoff relied on. Ney explained in his expert report that AASHTO:

> recommends that each driveway intersection provide both [s]topping and [i]ntersection [s]ight [d]istances. Stopping [s]ight [d]istance is the distance needed to see to bring a vehicle to an emergency stop. It is the sum of the distance travelled during brake reaction time (time from seeing [an] object to actually applying brakes) and braking distance. Intersection [s]ight [d]istance is the time to permit the driver to anticipate and avoid potential collisions. Both [i]ntersection and [s]topping . . . or si[ght] distances are based on vehicle approach and roadway grades.

Ney testified that an appropriate speed and the grade of the road must first be determined in order to assess the adequacy of sight distance. Ney noted that Simoff used twenty miles-per-hour in his traffic study analysis, which was an improper speed for

determining appropriate sight distances along Mayflower Drive because the posted speed limit was twenty-five-miles-per-hour, and industry standards indicated that speeds at least five-miles-per-hour over the posted speed limit should be used. In addition, the Chief of Police suggested that any analysis not use less than twenty-five-miles-per-hour.

Ney opined that the sight distance measured at the curb line of Mayflower Drive was only marginally better than the sight distance measured from the property line; however, in either instance, the stopping distance and intersection distance for the proposed driveway was not safe. Ney concluded that the safe stopping sight distance from the driveway was 147 feet to the left toward Elkwood Terrace and 165 feet to the right in an easterly direction on Mayflower Drive. The minimum intersection sight distance was 240 feet to the left toward Elkwood Terrace and 308 feet to the right easterly along Mayflower Drive. Based on his field measurements, Ney found that the sight distance to the left toward Elkwood Terrace was only 85 feet and 180 feet to the right easterly on Mayflower Drive. Thus, he concluded the driveway did not meet the safe stopping sight distance and intersection sight distance, and thus violated the AASHTO safe stopping sight distance and intersection sight distance standards, thereby failing to provide minimum design and safety requirements.

Ney also testified that at the time of his investigation, there was no vegetation within the right-of-way of Mayflower Drive blocking sight distances. Ney noted that Simoff had found the sight distance to be 150 feet within the right-of-way if the vegetation was cleared. Ney testified that he measured the sight distance after the vegetation was cleared and it was only 85 feet. Lastly, Ney noted that when a vehicle was at the curb line of Mayflower Drive rather than at plaintiff's property line, the sight distance was increased to 105 feet. He concluded, however, it made no difference, as in either case the safe sight distance criteria for stopping sight distance and intersection sight distance was not met.

In a December 14, 2011 resolution, the Board made detailed findings and denied the 2010 application and variance. The Board first found that the property ended at the right-of-way of Mayflower Drive. The Board noted that plaintiff's deed had a call for the property up to the westerly street line of Mayflower Drive; plaintiff could not have expected that the property extended beyond the right-of-way; plaintiff's deed did not reference a stone monument; and the LDR's definition of "lot area" did not include

any portion of a right-of-way.[1]  The Board expressed its skepticism that plaintiff found a stone monument several years after withdrawing the 2004 application, which shifted the property line and thus removed the variance impediment to the 2010 application.

The Board found that the 41.68-foot frontage for proposed Lot 3.02 represented an approximately eighteen percent deficiency in required lot width at Mayflower Drive, which was a substantial deviation from the requirements of the LDR.  Accordingly, the Board concluded that a variance was required for lot width at the street line of Mayflower Drive.

The Board explained why it found Ney's testimony more credible than Simoff's testimony.  The Board concluded that the application did not comply with RSIS or with minimum design and safety standards because the driveway failed to meet stopping sight distance completely, intersection sight distance partially, and provide minimum design and safety requirements.

The Board noted that there was an existing driveway constructed on the property as a result of the 2007 permit.  The Board emphasized that the 2007 permit was issued without Board or Board of Adjustment review, and the RSIS safety standards governed

---

[1]  Section 35-201 of the LDR defines "lot area" as "the area contained within the lot lines of a lot, but shall not include any portion of a right-of-way."

the 2010 application. Thus, the Board concluded that the driveway was not grandfathered in, nor did it give plaintiff any rights in connection with the 2010 application.

The Board determined that plaintiff failed to satisfy the positive and negative criteria for a variance under N.J.S.A. 40:55D-70c(1). Regarding the positive criteria, the Board rejected plaintiff's argument that the curvature of Mayflower Drive was a unique physical feature of the property that caused an undue hardship. Rather, the Board found that the physical features of Mayflower Drive bore directly on the problems with safe sight and stopping distances, and those features directly affected the Board's determination that the driveway was not safe.

The Board also found that plaintiff failed to demonstrate exceptional or practical difficulties on the property. The Board emphasized that plaintiff purchased the property as one lot, and should not have been surprised that the property did not extend into the right-of-way of Mayflower Drive because the deed noted the property extended up to the street line of Mayflower Drive, and a survey was referenced in the deed. The Board noted that plaintiff could still use the property for a home, build a large house, or add a pool or tennis court. The Board also noted that plaintiff sought a construction permit for a pool and patio, but

12

never constructed them. Thus, the Board concluded any hardship was self-created.

The Board also determined that the property was not so unique as to create a hardship. The Board found the property was on a sloped lot which was similar to a very substantial portion of Tenafly on the East Hill, and therefore, not unique to the property. The Board also found that the eighteen percent deviation from the frontage requirement was substantial, and this was particularly notable in that the R-40 zone is right across the street and adjacent from the property along Mayflower Drive, and the R-40 zone requires a minimum 90-foot frontage. The Board concluded it would not be good practice to create even smaller lot widths when the property was adjacent to an even larger zone district.

Regarding the negative criteria, the Board found as follows:

> The safety issues presented above concerning the safe stopping sight distance and safe intersection sight distances present very real concerns and demonstrate to the Board that it would not be appropriate to subdivide this property and place another house with an active driveway onto that location. Not only would it be a violation of RSIS, but it would be a substantial detriment to the public health and safety. Thus, the applicant cannot satisfy the negative criteria for variance relief.

Plaintiff filed a complaint in lieu of prerogative writs against the Board, the Borough of Tenafly (Borough), and other defendants. As to the Board, plaintiffs sought to overturn the denial of the 2010 application and variance. As to the Borough, plaintiffs asserted a claim of wrongful taking.

In a bifurcated proceeding, Judge Menelaos W. Toskos resolved plaintiff's claims against the Board. In an October 22, 2012 written opinion, the judge affirmed the Board's decision. The judge examined the record to determine if there was a basis to grant a c(1) variance. Regarding the positive criteria, the judge noted that the property presently conformed to all local ordinances; plaintiff treated the property as one lot; and the lot could accommodate expansion of the present house, a bigger house, and a pool and patio. The judge also noted that the property presently complied with the 50-foot frontage requirement, and the lack of frontage in the rear of the property did not prevent plaintiff from utilizing the entire property. The judge concluded that the claimed undue hardship was self-created, as it will only arise if the property is subdivided and if the proposed Lot 3.02 fronts Mayflower Drive.

Regarding the negative criteria, Judge Toskos found the record supported the Board's determination that the driveway would be a detriment to the public good. The judge concluded the record

14

supported the Board's decision to deny the 2010 application and variance, and the decision was not arbitrary, capricious, or unreasonable.

Plaintiff filed an appeal, which we dismissed as interlocutory. Plaintiff then proceeded against the Borough. Plaintiff retained a new surveyor, who prepared a new survey in June 2013, which now showed the frontage was 54.2 feet along Mayflower Drive. Armed with this new expert and survey, and having obtained a default against the Borough, plaintiff appeared at an uncontested proof hearing before Judge Lisa A. Firko. In a July 23, 2015 judgment and written opinion, the judge ordered the Borough to set a new right-of-way line on Mayflower Drive at 54.2 feet consistent with the new survey. However, the judge did not order the Borough to compel the Board to change its denial of the 2010 application or variance.

On September 2, 2015, plaintiff filed an appeal from Judge Toskos' October 22, 2012 judgment affirming the Board's denial of the 2010 application and variance. On appeal, plaintiff argues a c(1) variance is not required because Judge Firko established the frontage along Mayflower Drive at 54.2 feet as a matter of law. Plaintiff also argues that: (1) the burden of proof for a c(1) variance was met; (2) even if the frontage was deficient, the deficiency was de minimus; (3) the Board made an improper

A-0111-15T2

determination as to the safety of the driveway on Mayflower Drive; (4) the Board's reliance on Ney was arbitrary, capricious, and unreasonable; and (5) the Board's legal determination that a variance was needed is not entitled to any presumption of validity.

We review the Board's decision using the same standard as the trial court. Cohen v. Bd. of Adjustment of the Borough of Rumson, 396 N.J. Super. 608, 614-15 (App. Div. 2007). Like the trial court, our review of a planning board's decision is limited. Smart SMR of N.Y., Inc. v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 327 (1998). "[B]ecause of [its] peculiar knowledge of local conditions," the Board's factual findings are entitled to substantial deference and are presumed valid. Burbridge v. Twp. of Mine Hill, 117 N.J. 376, 385 (1990) (quoting Medici v. BPR Co., 107 N.J. 1, 23 (1987)). We give deference to a planning board's decision and reverse only if its action was arbitrary, capricious, or unreasonable. Zilinsky v. Zoning Bd. of Adjustment of Verona, 105 N.J. 363, 367 (1987). In reviewing a planning board's decision, we must determine whether it was reasonably supported by the record. Nextel of New York, Inc. v. Borough of Englewood Cliffs Bd. of Adjustment, 361 N.J. Super. 22, 38 (App. Div. 2003).

We give even greater deference to a planning board's decision to deny a variance in preservation of a zoning plan. Ibid. Where a planning board has denied a variance, the applicant must prove

that the evidence before the board was "overwhelmingly in favor of the applicant." Ibid. (quoting Ne. Towers, Inc. v. Zoning Bd. of Adjustment of W. Paterson, 327 N.J. Super. 476, 494 (App. Div. 2000)). The Board's conclusions of law, however, are subject to de novo review. Nuckel v. Little Ferry Planning Bd., 208 N.J. 95, 102 (2011) (citation omitted).

We decline to address plaintiff's argument that a variance is not required because Judge Firko established the frontage along Mayflower Drive at 54.2 feet as a matter of law. Our review is limited to the record before the Board. Kempner v. Edison, 54 N.J. Super. 408, 417 (App. Div. 1959). In addition, we do not address issues not raised before the trial court that are not jurisdictional in nature or substantially implicate the public interest. Zaman v. Felton, 219 N.J. 226-27 (2014) (citation omitted). We also will not consider documents not presented to the Board or Judge Toskos. See N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278 (2007). Accordingly, we focus on the issues relating to the appeal of the October 12, 2012 judgment.

To obtain a "c" variance, the applicant must satisfy the "positive criteria" and "negative criteria" embodied in N.J.S.A. 40:55D-70c(1). Cell S. of N.J. v. Zoning Bd. of Adjustment, 172 N.J. 75, 82 (2002). The burden of proving the positive and

negative criteria for a "c" variance lies with the applicant. See Ten Stary Dom P'ship. v. Mauro, 216 N.J. 16, 30 (2013).

"A c(1) variance requires proof of the 'positive criteria,' which are predicated on 'exceptional and undue hardship' because of the exceptional shape and size of the lot." Lang v. Zoning Bd. of Adjustment of No. Caldwell, 160 N.J. 41, 55 (1999) (citation omitted). To satisfy the "positive criteria," the applicant must show

> (a) by reason of exceptional narrowness, shallowness or shape of a specific piece of property, or (b) by reason of exceptional topographic conditions or physical features uniquely affecting a specific piece of property, or (c) by reason of an extraordinary and exceptional situation uniquely affecting a specific piece of property or the structures lawfully existing thereon, the strict application of any regulation pursuant to [N.J.S.A. 40:55D-62 to -68.6] would result in peculiar and exceptional practical difficulties to, or exceptional and undue hardship upon, the developer of such property, grant, upon an application or an appeal relating to such property, a variance from such strict application of such regulation so as to relieve such difficulties or hardship[.]
>
> [N.J.S.A. 40:55D-70c(1).]

An applicant must show that exceptional or undue hardship will result if the variance is not granted. Chirichello v. Zoning Bd. of Adjustment, 78 N.J. 544, 552 (1979). What is essential is that

18

the unique condition of the property must be the cause of the hardship claimed by the applicant. Lang, supra, 160 N.J. at 56.

The hardship criteria of a c(1) variance is unaffected by personal hardship, financial or otherwise. Ten Stary Dom P'ship., supra, 216 N.J. at 29. The focus is "whether the strict enforcement of the ordinance would cause undue hardship because of the unique or exceptional conditions of the specific property." Lang, supra, 160 N.J. at 53. The hardship standard does not require the applicant to prove that without the variance the property would be zoned into inutility. Id. at 54. The applicant need only demonstrate that the property's unique characteristics inhibit the extent to which the property can be used. Id. at 55. A c(1) variance is not available to provide relief from a self-created hardship. Chirichello, supra, 78 N.J. at 553. Where the hardship has been created by the applicant, a (c)(1) variance will normally be denied. Jock v. Zoning Bd. of Adjustment, 184 N.J. 562, 591 (2005).

To satisfy the "negative criteria," the applicant must demonstrate that: (1) the application relates to a specific piece of property; (2) the purposes of the Municipal Land Use Law, N.J.S.A. 40:55D-1 to -129, would be advanced by a deviation from the zoning ordinance requirement; (3) the variance can be granted without substantial detriment to the public good; (4) the benefits

19

of the deviation would substantially outweigh any detriment; and (5) the variance will not substantially impair the intent and purpose of the zone plan and zoning ordinance. <u>Jacoby v. Englewood Cliffs Bd. of Adjustment</u>, 442 <u>N.J. Super.</u> 450, 451 (App. Div. 2015); <u>see also</u> <u>N.J.S.A.</u> 40:55D-70c(1).

The "negative criteria" is not satisfied where "merely the purposes of the owner will be advanced." <u>Kaufmann v. Planning Bd. of Warren</u>, 110 <u>N.J.</u> 551, 563 (1988). Rather, the community must actually receive a benefit due to the fact that the variance represents a better zoning alternative for the property. <u>Ibid.</u> Thus, the focus of the "negative criteria" is on the characteristics of the land that present an opportunity for improved zoning and planning for the benefit of the community. <u>Ibid.</u> The "negative criteria" also focuses on the impact that the variance will have on the specific adjacent properties affected by the deviations from the ordinance, <u>Lang</u>, <u>supra</u>, 160 <u>N.J.</u> at 57, as well as any detriment to the zoning plan. <u>Kaufmann</u>, <u>supra</u>, 110 <u>N.J.</u> at 565.

The record amply supports Judge Toskos's and the Board's finding that plaintiff failed to demonstrate the "positive criteria" for a c(1) variance. Plaintiff's property is not unique and contains no exceptional conditions or characteristics that inhibit the extent to which the property can be used. Plaintiff

20

purchased and treated the property as one lot that, as per the deed and referenced survey, extended up to the street line of Mayflower Drive. Plaintiff used the lot for residential purposes and can continue to use the entire lot for that purpose. The lot conforms with the LDR, and there is nothing on the lot itself that is the cause of the claimed hardship. Rather, the proposed subdivision and need for a variance creates the hardship. See Chicalese v. Monroe Twp. Planning Bd., 334 N.J. Super. 413, 417 (Law Div. 2000). Thus, the alleged hardship is self-created.

In addition, plaintiff asserts that the curvature of Mayflower Drive creates a hardship. However, difficulties created by an off-site condition provide no basis for c(1) variance relief. Menlo Park Plaza v. Woodbridge, 316 N.J. Super. 451, 461 (App. Div. 1998). Accordingly, plaintiff failed to satisfy the "positive criteria" and is not entitled to c(1) variance relief.

The record also amply supports Judge Toskos's and the Board's finding that plaintiff failed to demonstrate the "negative criteria" for a c(1) variance. The driveway serves only plaintiff's purpose, see Kaufmann, supra, 110 N.J. at 563, and it fails to meet stopping sight distance completely, intersection sight distance partially, or provide minimum design and safety requirements. The driveway creates an unsafe condition that would be a detriment to the public health and safety.

We have considered plaintiff's remaining arguments in light of the record and applicable legal principles and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We are satisfied that the record amply supports the Board's decision to deny the 2010 application and variance, and the Board's decision is not arbitrary, capricious, or unreasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION