824 A.2d 198 (2003)
361 N.J. Super. 22
NEXTEL OF NEW YORK, INC. d/b/a Nextel Communications, Plaintiff-Appellant,
v.
BOROUGH OF ENGLEWOOD CLIFFS BOARD OF ADJUSTMENT, Defendant-Respondent, and
Mayor and Council of the Borough of Englewood Cliffs, and The Borough of Englewood Cliffs, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued April 28, 2003.
Decided June 3, 2003.
*201 Gregory J. Czura, Ringwood, argued the cause for appellant (Czura Stilwell, attorneys; Mr. Czura, on the brief).
Joseph R. Mariniello, Fort Lee, argued the cause for respondents (Mariniello & Mariniello, attorneys; Mr. Mariniello, on the brief).
Before Judges PETRELLA, LINTNER and PARKER. *199
*200 The opinion of the court was delivered by LINTNER, J.A.D.
Plaintiff, Nextel of New York, Inc. d/b/a Nextel Communications, appeals from a Final Order of the Law Division finding that the Board of Adjustment of the Borough of Englewood Cliffs' (the Board) denial of plaintiff's application to place telecommunications antennas on two buildings in Englewood Cliffs did not violate the Telecommunications Act of 1996(TCA), 47 U.S.C.A. § 332, and was not arbitrary, capricious, or unreasonable. We affirm.
The procedural history and relevant facts are as follows. Plaintiff is licensed by the FCC to provide wireless telecommunications coverage. The company provides both cellular and two-way walkie-talkie services within the area of its network. In September 2000, plaintiff applied to the Board for a use variance and site plan approval to install wireless communications facilities on two buildings in Englewood Cliffs, one located at 600 Sylvan Avenue and the other at 301 Sylvan Avenue. At the 600 Sylvan Avenue site, plaintiff would also construct a 10-foot by 20-foot equipment shelter. At the 301 Sylvan Avenue site, the equipment was to be located within the existing building. Both buildings are surrounded by parking.
600 Sylvan Avenue is a four-story office building that measures 45 feet tall to its roof line. Its roof has an existing 12-foot-high equipment penthouse for Omnipoint's wireless communications and an HVAC cooling tower that rises 57 feet *202 above ground level. The proposed antennas would rise to 51 feet above ground level.
301 Sylvan Avenue is a two-and-a-half story office building. The rooftop at 301 Sylvan Avenue holds existing antennas and equipment owned by AT & T Wireless and Verizon,[1] which had been placed there apparently without the permission of municipal officials. 301 Sylvan Avenue measures 27 feet to the top of its roof line, with the existing equipment bringing the height to 37 feet. The proposed antennas would rise to only 31 feet. The maximum building height in the zone is 35 feet.
In response to the requirements of Section 704(a) of the TCA, 47 U.S.C.A. § 332(c)(7), the Borough enacted Ordinance 9909 "To Permit and Regulate Wireless Communications Towers and Antennas." The ordinance permitted towers only on Lots 4 and 5 in Block 513 and Lot 3 in Block 412.[2] Towers and antennas were prohibited at all other sites in the Borough. The Ordinance set forth height,[3] setback, and lot coverage requirements; standards for landscaping and equipment cabinets; and procedures for construction applications. The designated lots were rezoned from B-4 and B-2 to a newly created "public zone," P-1. Permitted uses in the public zone were police stations, firehouses, libraries, municipal buildings and other public and governmental uses, accessory parking areas and buildings, and wireless communications towers as accessory or principal uses. Public parks and public recreation areas were conditional uses in the zone.
As to preexisting towers and antennas, the ordinance provided: "Preexisting towers and preexisting antennas are not required to meet the requirements of this ordinance other than the requirements of Section 4(d) [state and federal requirements for towers], absent any enlargement or structural modification of the addition of any structures." "Preexisting Towers and Preexisting Antennas" were defined as: "Any tower or antenna for which a building permit has been properly issued prior to the effective date of this ordinance, including permitted towers that have not yet been constructed so long as such approval is current and not expired."
The ordinance provided that its purpose was
to establish general guidelines for the siting of wireless communication towers and antennas. The goals of this ordinance are to: (1) protect residential areas and land uses from potential adverse impacts of towers and antennas; (2) encourage the location of towers in nonresidential areas; (3) minimize the total number of towers throughout the community; (4) strongly encourage the joint use of new and existing tower sites as a primary option rather than construction of additional single-use towers; (5) encourage users of towers and antennas to locate them, to the extent possible, in areas where the adverse impact on the community is minimal; (6) encourage users of towers and antennas to configure them in a way that minimizes the adverse visual impact of the towers and antennas through careful design, siting, landscape screening, and innovative camouflaging techniques; (7) enhance *203 the ability of the providers of telecommunications services to provide such services to the-community quickly, effectively, and efficiently; (8) consider the public health and safety of communications towers; and (9) avoid potential damage to adjacent properties from tower failure through engineering and careful siting of tower structures. In furtherance of these goals, the Borough of Englewood Cliffs shall give due consideration to the Borough of Englewood Cliffs' master plan, zoning map, existing land uses, and environmentally sensitive areas in approving sites for the locations of towers and antennas.
Ronald Peterson, an expert regarding electromagnetic fields, testified on plaintiff's behalf that proposed radio frequency emissions at both sites complied with FCC standards. Naimat Mughal, a senior radio frequency engineer employed by plaintiff, testified as both a fact witness and as an expert in the field of radio frequency engineering. According to Mughal, plaintiff sought to install the antennas to eliminate a "gap" in service to its customers. "Gaps" created the possibility that a mobile call would be dropped as it was handed over from one site to the next. Mughal's testimony regarding its parameters focused on two "overlays" that were submitted into evidence.[4] The Borough's existing coverage was being provided by two sites in Fort Lee.
Much of Mughal's testimony was provided in response to the Board's efforts to understand why the antennas could not be placed on a tower located on municipal property in the area zoned for communications facilities. The municipal tower is located six blocks from 301 Sylvan Avenue. Mughal testified that an antenna placed at the 130-foot level on the municipal tower, rather than at the two proposed locations, would provide "identical" coverage to the north, and "a little bit more" coverage to the south. However, he also testified that an antenna located at this height would create interference with plaintiff's antennas at other sites because the signals emitted would be too strong and would not "die off" as necessary. According to Mughal, plaintiff's system required that its different sites be able to "reuse" frequencies when a signal had died off, and a strong signal would not allow plaintiff's other sites to reuse the signal because the signal would not be dissipated by buildings and the tree line. Moreover, Mughal opined that if the antennas were installed at a lower level on the municipal tower, for example 65 feet, the signal would be insufficient to eliminate the gap to the south, and plaintiff would still be required to use the two proposed sites at 301 Sylvan Avenue and 600 Sylvan Avenue.
Mughal had no report or evidence to support his conclusion, nor did he provide any specific test data or perform an analysis; he essentially based his opinion on his "experience." Although he testified that he expected plaintiff would achieve sufficient coverage with the two proposed sites, such that it would not require additional antenna locations in the Borough, he acknowledged that plaintiff's system was evolving and that it was dismantling sectors at some of its higher sites because of reuse problems. He also had no written report evidencing his analysis concerning the non-viability of the municipal site due to interference. Further, his testimony respecting interference was somewhat confusing and inconsistent. At one point he testified that plaintiff's sites in the Bronx do not interact with sites west of the Hudson river, while at another point he indicated that use of the 130-foot monopole *204 belonging to the Borough would cause interference with plaintiff's operation in the Bronx. He acknowledged that he had done no written analysis of whether the municipal site could be viable if plaintiff adjusted the transmission from its other sites. In response to requests, he indicated that he would submit a written analysis concerning interference based upon his computer data.
Janice Talley, a licensed professional planner, testified on plaintiff's behalf that the application should be granted because the proposal would advance the purposes of the Borough's ordinance and could be granted without substantial detriment. Talley opined that the site was suitable because it was not located in a residential zone; it was surrounded by office buildings, commercial properties, and parking lots; 600 Sylvan Avenue was shielded by a large number of trees; and the buildings had existing antennas such that the additional antennas would have very little visual impact. She conceded that her testimony was based on the assumption that plaintiff would be unable to provide coverage if it could not locate its antennas at the selected sites.
Malcolm Kasler, a planning consultant retained by the Board, testified as a planning expert. He indicated that, according to plaintiff's application, 600 Sylvan Avenue required three "d" variances: a use variance under N.J.S.A. 40:55D-70d(1); a variance for expansion of a nonconforming use under N.J.S.A. 40:55D-70d(2), based on the fact that the building had an existing telecommunications facility on the roof; and a height variance under N.J.S.A. 40:55D-70d(6). Kasler testified that the building itself did not conform to a number of bulk regulations for the B-2 zone, including setback and rear yard requirements, but that plaintiff's application would not exacerbate the nature of those existing nonconformities. He was of the opinion that the addition of the equipment shelter increased the number of stories and required a variance under N.J.S.A. 40:55D-70(c). He did not mention that the roof at 600 Sylvan Avenue already held an equipment penthouse or explain why the proposed shelter would constitute an additional story above the existing penthouse.
Kasler designated the existing telecommunications facilities as "nonconforming" and stated the following as the basis of his opinion:
You will recall there was some question raised as to how these facilities were located there. Nobody knew so we don't know whether they were placed there legally or in some other fashion but by adding additional antennas onto the roof, this also would require a D-2 variance which is an expansion of a non conforming use.
Kasler concluded that the applicant had not met the positive criteria for a variance. According to Kasler, the proposal was inconsistent with the land use element of the master plan respecting wireless communications facilities and the purpose of the ordinance because (1) the 600 Sylvan Avenue location was "considerably less" than 500 feet from residences located to its west; (2) the application did not minimize the total number of towers and antennas in the community because the proper antennas were not sited at the location that the municipality had designated for such purposes; and (3) the application did not encourage joint use of a site by multiple carriers because the existing facility represents nonconforming uses that were believed to have been put up illegally. He stated that there was "no definition [sic] that shows these facilities were done under a permit."
The township engineer, Andrew Hipolit, reviewed plaintiff's submission entitled *205 "Interference Report Concerning Nextel's Use of Municipal Tower Site," submitted in response to the Board's concerns expressed during Mughal's testimony. Hipolit testified that the report did not answer the questions because it merely discussed interference with the two proposed sites, rather than showing whether other surrounding sites could be adjusted so that the antennas could be located on the municipal site without the interference problem. Hipolit was concerned with the report's indication that the issue was one of "trial and error."
During the hearings, the township's attorney announced that several Board members had recently obtained plaintiff's service and were aware that its website indicated "that there is complete coverage for the entire East Bergen area." Plaintiff's attorney dismissed the claim essentially as sales puffery saying: "[T]hat is nice and you got our sales brochures that say we got [sic] great coverage. You will get that from all the carriers when selling a service. They're going to tell you how great it is." At its October 15, 2001 meeting the Board unanimously rejected plaintiff's application. The Board members' comments concentrated on Mughal's testimony and their feelings that Mughal never fully explained why plaintiff was unable to use the municipal tower or why the antennas at the proposed sites were necessary.
On November 12, 2001, the Board issued two resolutions, one for each site. The resolutions were substantially similar. The Board stated that, with respect to 600 Sylvan Avenue, it considered the application "as a D variance, a use variance and height variance, along with variances to continue to increase prior nonconformity with rear, side and total side yard distances and with coverage requirements." As to 301 Sylvan Avenue, it considered the application "as a D variance" and "a use variance." In each resolution, the Board rejected plaintiff's contention that the antennas were necessary for plaintiff to ensure coverage in the surrounding area. It found that Peterson's and Mughal's testimony and the exhibits "demonstrate[d] that coverage for the Englewood Cliffs [area] and the surrounding area for Nextel are completely covered at the present time and that the implementation of additional antennas on [each building] is merely `a tweaking' desired by Nextel engineers but not necessary."
The Board found Mughal's testimony "not convincing," "conflicting," and "sometimes not believable." The resolution recited that Mughal's testimony that the antennas placed at both proposed sites are necessary to "ensure coverage of Englewood Cliffs and the surrounding areas and that the applicant could not use the Town site because of frequency gaps and interruptions and pass offs" was in conflict with his other testimony respecting present coverage, the use of the municipal tower at various heights, plaintiff's constant changes in order to make old sites compatible with new ones, and the fact that the sites in Fort Lee were changing but Mughal would not know the effect on the proposed sites until the changes were made. The materials prepared by plaintiff for its Internet site and for public use that stated "there is sufficient coverage in the Englewood Cliffs area and the surrounding areas" also weighed heavily on the Board's factual determination. The Board "totally rejected" plaintiff's counsel's characterization of the material "as exaggeration."
The Board found that the variances could not be granted without substantial detriment to the public good, and that they would substantially impair the intent and *206 purpose of the zoning plan and zoning ordinance because:
[T]his application does not enhance the Borough's goals and objectives, it does not provide a desirable visual environment, it does not maintain both the areas separating residential areas from nearby nonresidential uses, it does not encourage the location of this type of facility in an area zoned for that type of facility, it also does not minimize the total number of such antennas which could be spread throughout the community and it certainly does not encourage the certain use of the site for use of multiple carriers on a single site zoned for that use.
The Board also found that "there is room on the Municipal tower and the appropriate zoned area for an additional antenna" and that "any tweaking that is necessary for the Nextel system, Englewood Cliffs or the immediate area can be done by either making adjustments at other sites already in use or by use of antennas in an area already zoned in Englewood Cliffs for such use."
As to the effect of the existing antennas on both buildings, paragraphs five, six, and seven of the two resolutions were identical:
5. The testimony showed that there are presently roof top antennas and equipment on the premises from Bell Atlantic Mobile and AT & T although there has been no application for such antennas before either the Board or the Planning Board of the Borough.
6. The Board finds and determines that those uses as they exist were placed on the building without permission of Municipal officials.
7. It is assumed that said antennas were placed prior to the enactment of Ordinances 9715, 9909 and Ordinance 2000-02 which ordinances amend the Ordinances of the Borough to permit and regulate wireless communications towers and antennas. Ordinance No. 2002-02 having been passed and adopted by the Governing Body and which contains the precondition in section 3C providing that preexisting antenna are not required to meet the requirements of this ordinance absent any enlargement or structural modifications.
Plaintiff's initial complaint in lieu of prerogative writs was followed with an amended complaint filed on June 19, 2002, alleging in Count One that the Board's action (1) violated the TCA, (2) was arbitrary, capricious, legally untenable and in excess of its authority, and (3) was unlawfully discriminatory. In the second count, plaintiff sought to declare the Borough's wireless ordinance illegal, ultra vires, and violative of the TCA, the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1-7, and the New Jersey Anti-Trust Act, N.J.S.A. 56:9-1 to -19. Plaintiff also sought treble damages pursuant to the Sherman Anti-Trust Act, 15 U.S.C.A. § 15(a).
On May 2, 2002, Judge Harris heard argument, following which he found that the Board's action did not violate the TCA because there was sufficient credible evidence for the Board to come to the conclusion that plaintiff had failed to adequately demonstrate that significant gaps in service existed and its proposal was not the least intrusive means of filling gaps. He also found that the Board's action denying the variance was not arbitrary, capricious, or unreasonable because there was sufficient evidence in the record to support its conclusion not to accept Mughal's testimony as credible and, therefore, plaintiff had failed to establish the positive criteria for demonstrating site suitability by showing *207 that there was a need for the facility at the proposed site.[5]
Plaintiff filed a stipulation dismissing the second count of its complaint without prejudice. The order memorializing Judge Harris's decision was filed on July 23, 2002. This appeal followed. Plaintiff raises the following points.
POINT I
THE BOARD'S DENIAL OF NEXTEL'S APPLICATION WAS ARBITRARY, UNREASONABLE, AND CAPRICIOUS UNDER NEW JERSEY LAW. THE TRIAL COURT ALSO FAILED TO ANALYZE THIS CASE IN ACCORDANCE WITH NEW JERSEY LAW.
POINT II
THE BOARD'S DENIAL OF THIS APPLICATION, AS WELL AS THE BOROUGH'S FAILURE TO ACCOMMODATE THE NEEDS OF THIS WIRELESS PROVIDER, VIOLATES THE 1996 TELECOMMUNICATIONS ACT (47 U.S.C. SECTION 332(C)7(B) ET SEQ.)
POINT III
THE DECISION OF THE TRIAL JUDGE REGARDING THE "NEED" FOR THE SUBJECT SITES, IS NOT SUSTAINABLE WHEN VIEWED IN LIGHT OF LAKEWOOD.

We reject plaintiff's contentions and affirm substantially for the reasons expressed by Judge Harris in his oral opinion of May 2, 2002.
The applicable underlying zoning principles are well-settled. Under N.J.S.A. 40:55D-70d, the Board can grant a variance for special reasons to permit, among other things, a use or principal structure in a district in which such uses or structures are restricted, an expansion of a nonconforming use, or a height of a principal structure that "exceeds by 10 feet or 10% the maximum height permitted in the district for a principal structure." The applicant must satisfy both the "positive" criteria, or "special reasons" for the grant of the variance, and the "negative" criteria, showing that the variance "`can be granted without substantial detriment to the public good'" and that it "`will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.' " Sica v. Board of Adjustment, 127 N.J. 152, 156, 603 A.2d 30 (1992) (quoting the applicable version of N.J.S.A. 40:55D-70d). "Generally, to satisfy the positive criteria, an applicant must prove that `the use promotes the general welfare because the proposed site is particularly suitable for the proposed use.'" Smart SMR of New York, Inc. v. Borough of Fair Lawn Board of Adjustment, 152 N.J. 309, 323, 704 A.2d 1271 (1998) (quoting Medici v. BPR Co., 107 N.J. 1, 4, 526 A.2d 109 (1987)); see also Omnipoint Communication, Inc. v. Board of Adjustment, 337 N.J.Super. 398, 419, 767 A.2d 488 (App. Div.), certif. denied, 169 N.J. 607, 782 A.2d 425 (2001). An FCC license will satisfy the first requirement of the positive criteria and establish that the facility serves the general public welfare. Smart SMR, supra, 152 N.J. at 336, 704 A.2d 1271. However, an applicant for a telecommunications facility also must show that the site is particularly suited for the use in order to establish the positive criteria. Ibid. To establish the negative criteria there must be proof demonstrating that the "`variance sought is not inconsistent with the intent *208 and purpose of the master plan and zoning ordinance.'" Id. at 323, 704 A.2d 1271 (quoting Medici, supra, 107 N.J. at 21, 526 A.2d 109).
A municipal zoning board is entrusted with the sound discretion to determine whether an applicant has met the statutory criteria to obtain a variance. Kaufmann v. Planning Board, 110 N.J. 551, 558, 542 A.2d 457 (1988); Home Builders Ass'n v. Borough of Paramus, 7 N.J. 335, 341-42, 81 A.2d 753 (1951); Northeast Towers, Inc. v. Zoning Board of Adjustment, 327 N.J.Super. 476, 493, 744 A.2d 190 (App.Div.2000). It is not the role of a reviewing court to determine if the decision was wise or unwise. Kaufmann, supra, 110 N.J. at 558, 542 A.2d 457. The reviewing court's role is limited to determining whether the board's decision was reasonably supported by the record. Kramer v. Board of Adjustment, Sea Girt, 45 N.J. 268, 285, 212 A.2d 153 (1965). A board of adjustment's action is presumed to be valid, and the party attacking it has the burden of proving otherwise. New York SMSA Ltd. P'ship v. Board of Adjustment, 324 N.J.Super. 149, 163, 734 A.2d 817 (App.Div.), certif. denied, 162 N.J. 488, 744 A.2d 1210 (1999). A board's decision will not be set aside by a court unless it is arbitrary, capricious, and unreasonable. Smart SMR, supra, 152 N.J. at 327, 704 A.2d 1271; New York SMSA, supra, 324 N.J.Super. at 164, 734 A.2d 817. Furthermore, a board's denial of a variance is entitled to greater deference than a decision to grant the variance. Northeast Towers, supra, 327 N.J.Super. at 494, 744 A.2d 190. That heavier burden requires the proponent of the denied variance to prove that the evidence before the board was "`overwhelmingly in favor of the applicant.'" Id. at 494, 744 A.2d 190 (quoting Med. Realty Ass'n v. Board of Adjustment, 228 N.J.Super. 226, 233, 549 A.2d 469 (App.Div.1988)).
A nonconforming use is an existing use of property that was legally permissible prior to the adoption or revision of zoning laws that later prohibited the use or activity. N.J.S.A. 40:55D-5; Town of Belleville v. Parrillo's, Inc., 83 N.J. 309, 315, 416 A.2d 388 (1980). An existing nonconforming use will be permitted to continue only if the use remains substantially the same as the kind of use to which the premises were dedicated when the zoning ordinance was passed. Id. at 316, 416 A.2d 388. Expansion of nonconforming uses is disfavored. Urban v. Planning Board, 124 N.J. 651, 656, 592 A.2d 240 (1991). An expansion, enlargement, or substantial change in a nonconforming use requires a use variance under N.J.S.A. 40:55D-70d(2). Stop & Shop Supermarket Co. v. Board of Adjustment, 315 N.J.Super. 427, 436, 718 A.2d 1218 (App. Div.1998), rev'd on other grounds, 162 N.J. 418, 744 A.2d 1169 (2000). As with other use variances, an application for a variance to expand a nonconforming use must satisfy the positive and negative criteria of N.J.S.A. 40:55D-70. Fred McDowell, Inc. v. Board of Adjustment, 334 N.J.Super. 201, 214, 757 A.2d 822 (App.Div.2000), certif. denied, 167 N.J. 88, 769 A.2d 1051 (2001); Alpine Tower Co. v. Mayor & Council, 231 N.J.Super. 239, 248, 555 A.2d 657 (App.Div.1989).
With these principles in mind, we turn to plaintiff's argument that the Board's denials were arbitrary, capricious, or unreasonable. Plaintiff asserts that the reasons behind the denials were the "unsubstantiated musings of [the] Board and its undisguised efforts to get [plaintiff] to locate its facilities on municipal property presumably so that the municipality can get the rent." Plaintiff also argues that the evidence presented established that *209 "these facilities, if constructed as proposed, will have absolutely no effect on the neighborhood or zone plan at the sites chosen" and therefore cannot be legally denied. At the outset, we note that Judge Harris did not find that plaintiff failed to establish the negative criteria. Instead, his findings were limited to the positive criteria and he concluded that the evidence in the record supported the Board's determination that the positive criteria had not been proven. We need not consider plaintiff's protestations respecting the sufficiency of its proofs on the negative criteria because we are satisfied that Judge Harris properly found that plaintiff had not met its burden of proof on the positive criteria.
Finding that the Board was justified in rejecting the testimony of plaintiff's expert on the suitability of the proposed sites, Judge Harris stated:
The question is, is there ample evidence; is there substantial evidence as that phrase is understood. And what it comes down to is two facets. One, did the Board appropriately reject the testimony of site suitability by Mr. Mughal standing on its own, and did the Board reject the evidence on site suitability when viewed under the lens of the advertising material presented.
I conclude as follows. First, I do not believe that the Nextel Internet information and its brochures is irrelevant. I think that a board is entitled to consider.
It is admissible evidence. It's a statement of a party. It's not hearsay. It is clearly not expert testimony. But I think that it's something that a board is entitled to take into account.
I have reservations, however, as to whether or not if that were the only evidence that the Board was relying upon, that that would, in fact, sustain the substantial evidence test in light of the preference for expert testimony by the Supreme Court. And so standing alone, that evidence probably would not support the findings of the Board.
....
I've read the testimony of the radio frequency engineer a number of times. I've matched it up with exhibit A-1. I cannot say that it was arbitrary, capricious, or unreasonable for the Board to have difficulty in understanding what the expert was referring to, because I had difficulty and I had the leisure of reading and going back and rereading. The Board was confronted with the information and then had to react to it, albeit, nine months approximately later.
The gist of what the witness was talking about was that a gap exists, as shown by the overlays, and these two sites are the only sites that are necessary or appropriateor appropriate for the siting to fill these gaps. He then describes why the alternate site, and we'll call it the municipal site ... won't work, and as I understand his opinion, it relates to the idea that you can put one antenna array at 130 feet on the municipal antenna and you'll get the same coverage as the two separate sites.
But the problem is, as I understand the testimony, or at least as the applicant is promoting it, is that at that height, in order to get the coverage effectively... its too powerful, and because of the technology that reuses frequencies, there would be interference from this site with other sites.
There's a description of this reuse.... I'm not so sure that the expert made it so clear at the time of the hearing what his was all about....
....
And what the applicant was driving at here was that by having this antenna array 130 feet in the air, you get the *210 coverage on the ground. But the frequencies would trail off too close to other facilities.
Now, one of the problems with his testimony is this....
Q. So you couldn't tell us what specific other antenna's interference would be caused with as a result of placing it on our tower?
A. I am sorry.
Q. Okay. If you placed the 130 feet on the municipal tower, your antennaswhen I say it, I mean your antennas
A. Yes.
Q. You testified that in your opinion, there would be interference in the system. Correct?
A. That's correct.
Q. But you didn't do any specific tests for that, did you?
A. I did not. But out of my experience, I know that it would because I know.
Q. Okay. Let me just continue my thought. But you don't know what effect, what extent, or what location that interference would occur in?
A. I can tell by the fact it's a set pattern and we know how far away frequencies are being reused.
And then there's a further colloquy. That was the basic extent of the rationale for this reused frequency and the problem of interference, and as far as I can tell, it's a net opinion. It's not based upon a report. It's not based upon an analysis. It's based on what Mr. Mughal said; that is, "but out of my experience, I know that it would because I know."
That said, I cannot say that this Board was arbitrary, capricious, and unreasonable in concluding that the testimony of Mr. Mughal was unconvincing, was contradictory. When you couple that, then, with the Internet information and the glossy material, the brochure information, it fortifies the substantial evidence criteria.
Plaintiff argues that the Board could have retained its own expert and that its rejection of Mughal's testimony without testimony to the contrary was improper. We disagree. The burden of presenting persuasive proof on the special reasons criteria rested with plaintiff. Chirichello v. Zoning Board of Adjustment, 78 N.J. 544, 559-60, 397 A.2d 646 (1979). The purpose of an expert witness is to assist a factfinder in understanding the evidence. N.J.R.E. 702. The fact that plaintiff's expert was unsuccessful in doing so is not the fault of the Board. The record reflects that Mughal avoided answering the Board's queries regarding the viability of technical alternatives to placing the antennas at the proposed locations. Moreover, he never explained the nature of the alleged gap in quantifiable terms such as likelihood of dropped calls, or the number of customers who experienced them. Instead, he merely asserted that a gap existed. A board may accept or reject the testimony of any witness and, so long as it is reasonably made, that decision is conclusive on appeal. Kramer, supra, 45 N.J. at 288, 212 A.2d 153.
Ocean County Cellular Tel. Co. v. Township of Lakewood, 352 N.J.Super. 514, 800 A.2d 891 (App.Div.), certif. denied, 175 N.J. 75, 812 A.2d 1108 (2002), upon which plaintiff heavily relies, is clearly inapposite. There, Comcast's uncontradicted expert testimony that a significant gap existed was based upon concrete evidence that included a factual analysis that it had over 4000 "blocked" calls in a one-hour period due to the inordinate number of calls made by students at a local rabbinical college and that the proposed site was the *211 least intrusive means of closing the gap. Comcast presented substantial uncontradicted evidence that no other site was available or reasonable. Its expert studied five alternative sites and addressed the Board's questions concerning why they were not viable. Moreover, Lakewood's master plan and zoning ordinance did not permit telecommunications systems of any type within the municipal boundaries.
In Lakewood, we cautioned that the provider's conclusions on suitability "must be based upon competent expert testimony." Id. at 528-29, 800 A.2d 891 (emphasis added). Such conclusions are subject to challenge by the Board provided that the challenge has "a rational and factually grounded basis." Id. at 529, 800 A.2d 891. We also recognized that the Board is "free to either accept or reject the testimony" of an applicant's expert provided it is "`reasonably made,'" in which case it "`is conclusive on appeal.'" Id. at 537, 800 A.2d 891 (quoting Kramer, supra, 45 N.J. at 288, 212 A.2d 153). We concluded in Lakewood that the Board's rejection of Comcast's expert's testimony was not reasonable because the expert relied upon written reports, factual data, and accepted methodology. We also observed that the Board, "neither during the hearings nor in its resolution, ever questioned or rejected the expert's testimony" and that the Board's resolution "did not state that the experts lacked credibility." Id. at 537, 800 A.2d 891.
Here, unlike the expert testimony in Lakewood, Mughal offered no specific information regarding the nature of the gap, nor did he present an analysis based upon factual data. He avoided the Board's questions regarding the possibility of altering existing antennas so that plaintiff could locate its antennas on the municipal tower within the proper zone, notwithstanding his testimony that plaintiff regularly made adjustments to account for the effects of new antenna sites. Moreover, the Board's resolution set forth its reasons for rejecting Mughal's testimony.
An expert opinion must be supported by facts or data either in the record or of a type usually relied on by experts in the field. N.J.R.E. 703. An expert opinion that is not factually supported is a net opinion or mere hypothesis to which no weight need be accorded. See generally Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). "Opinions that lack a foundation are worthless. However, if an expert provides the whys and wherefores rather than bare conclusions it is not considered a net opinion." Beadling v. William Bowman Assocs., 355 N.J.Super. 70, 87, 809 A.2d 188 (App.Div. 2002) (citations omitted). Judge Harris concluded that the Board had sufficient reasons for rejecting Mughal's testimony on suitability. He also found that, based on his review of the record, Mughal's testimony was not competent because it amounted to a net opinion. This finding is unassailable.
With Judge Harris's independent finding that Mughal's testimony was a net opinion in mind, we turn to plaintiff's remaining contention that its proofs satisfied the TCA. Plaintiff contends that there was not substantial evidence supporting the Board's decision and, therefore, the Board's action was a violation of section 332(c)(7)(B)(iii). It also asserts that it is a victim of discrimination in violation of section 332(c)(7)(B)(i)(I) of the TCA, because "the Borough of Englewood Cliffs has previously approved functionally identical equipment" on the proposed rooftops without any need for an appearance before any board.
Sections 332(c)(7)(B)(i)(I), (II) provide:
(i) The regulation of the placement, construction, and modification of personal *212 wireless service facilities by any State or local government or instrumentality thereof
(I) shall not unreasonably discriminate among providers of functionally equivalent services; and
(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
The Act also provides: "Except as provided in [47 U.S.C.A. § 332(c)(7) ], nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C.A. § 332(c)(7)(A).
"Any decision by a State or local government to deny a request to place, construct, or modify personal wireless service facilities shall be supported by substantial evidence contained in a written record." 47 U.S.C.A. § 332(c)(7)(B)(iii). Thus, determinations under Section 332(c)(7)(B)(iii) are reviewed under the substantial credible evidence standard. Cellular Tele. Co. v. Zoning Board of Adjustment, 197 F.3d 64, 71 (3rd Cir.1999). By contrast, proof that significant gaps in service exist comes under the prohibition of Section 332(c)(7)(B)(i)(II), and is not reviewed under the substantial evidence standard. Deference is not afforded the local agency's findings in such cases. Ibid. Instead, de novo review is required when determining whether significant gaps in service exist. Ocean County, supra, 352 N.J.Super. at 524, 800 A.2d 891. Nevertheless, there must be competent proof that gaps exist in order for an applicant to prevail. Cellular Tele. Co., supra, 197 F.3d at 71.
The Board's denial of plaintiff's application to modify the proposed wireless facilities was supported by substantial evidence in the record, namely a plethora of specific and acceptable reasons for rejecting, as not credible, the testimony of the expert who claimed the modifications were suitable and necessary. 47 U.S.C.A. § 332(c)(7)(B)(iii). Furthermore, we are satisfied from our review of the entire record that Judge Harris correctly found that plaintiff's expert's testimony respecting the need and suitability for locating antennas at the proposed sites was not entitled to any weight as a net opinion. It follows that the judge appropriately concluded, de novo, that plaintiff's proofs failed to demonstrate, through competent expert testimony, that significant gaps existed, that the proposed sites were not necessary, and that they did not qualify as a less intrusive means of providing adequate coverage. Therefore, Judge Harris properly concluded that the Board did not violate Section 332(c)(7)(B)(i)(II).
We come to the same conclusion respecting plaintiff's claim of discrimination. Nowhere in the record does it appear that the pre-existing antennas at the proposed locations were approved by the Borough after enactment of its "Ordinance To Permit and Regulate Wireless Communications Towers and Antennas." The only indication in the record was that they were apparently erected without the proper building permit prior to the enactment of the Ordinance. Nevertheless, the Board, in reaching its decision, assumed that the pre-existing antennas at the proposed locations qualified as a nonconforming use. Plaintiff's failure to establish the positive criteria required for the expansion of a nonconforming use supports the reasonableness of the Board's denial of a variance on those grounds and militates against any claim of discrimination under *213 the TCA.[6] More importantly, plaintiff's claim of discrimination is not supported by any factual proof, much less substantial credible evidence in the record. Where an issue is based on mere conclusory statements by the brief writer, we will not consider it. Miller v. Reis, 189 N.J.Super. 437, 441, 460 A.2d 210 (App.Div.1983). Accordingly, although discrimination was not specifically addressed by Judge Harris, we see no need to intervene.
Affirmed.
NOTES
[1] Also referred to as Bell Atlantic Mobile.
[2] The ordinance was amended by Ordinance 2002-04 to rezone the Borough's Institutional Zone, Lot 5, Block 1302, to also permit wireless communications towers and antennas.
[3] The maximum permitted height of a tower was 130 feet.
[4] These overlays are not included in the record on appeal.
[5] During the pendency of the hearing, plaintiff submitted its bid, along with other providers, to place antennas on the Municipal Tower. However, plaintiff's bid was not accepted. Since then the Borough has amended its ordinance to provide for other sites within the Borough to erect telecommunications antennas.
[6] At oral argument on appeal, plaintiff conceded that failure of a provider to prove suitability would trump any claim of discrimination under the TCA.