NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5716-14T3

WORLD WHEAT FOUNDATION, INC.,

 Plaintiff-Appellant,

v.

PLANNING BOARD OF THE
TOWNSHIP OF SADDLE BROOK,

 Defendant-Respondent,

and

THE TOWNSHIP OF SADDLE BROOK,

 Defendant.
________________________________

 Argued December 21, 2016 – Decided July 20, 2017

 Before Judges Simonelli, Carroll and Gooden
 Brown.

 On appeal from the Superior Court of New
 Jersey, Law Division, Bergen County, Docket
 No. L-3217-14.

 Richard J. Kapner argued the cause for
 appellant.

 Stephen F. Pellino argued the cause for
 respondent (Basile Birchwale & Pellino, LLP,
 attorneys; Mr. Pellino, of counsel and on the
 brief).
PER CURIAM

 In this prerogative writ matter, plaintiff World Wheat

Foundation, Inc. appeals from the July 8, 2015 Law Division order

of judgment, which affirmed the denial of plaintiff's application

to defendant Planning Board of the Township of Saddle Brook (Board)

for site plan approval and a parking variance to permit plaintiff's

property to be used as a vocational school. For the following

reasons, we affirm.

 I.

 We derive the following facts from the record. Plaintiff is

a church-based, not-for-profit philanthropic organization.

Plaintiff purchased the property at issue in 2013. The property

consists of 29,198.27 square feet and is located in the B-2

Secondary Business Zone of the Township of Saddle Brook (Township).

Plaintiff's proposed use of the property as a vocational school

is a permitted use within the B-2 zone.

 Prior to plaintiff's acquisition of the property, it was

owned and operated by the Brookwood Convalescent Home, a full-time

residential facility for the elderly (the Convalescent Home),

which was not a permitted use in the B-2 zone. The Convalescent

Home began operations in 1964, but had ceased its operations for

approximately two-and-one-half years prior to the hearing on

plaintiff's application.

 2 A-5716-14T3
 Plaintiff submitted an application to the Board for site plan

approval. Plaintiff also sought a parking variance because the

application proposed twelve spaces, whereas the Township's

ordinance required thirty-three spaces.

 Plaintiff proposed to use the building located on the property

as a vocational school to assist working-class Korean families

with English, music, dance, and art. The intended students were

school-aged children and adults who would take English language

courses. Plaintiff's representative, Jay Kim, testified there

would be approximately fifty-five students and no food service

operations on the premises. The school's hours of operation would

be 8:00 a.m. to 10:00 p.m. Monday through Friday, and 8:00 a.m.

to 6:00 p.m. on Saturday. There would be three full-time

employees: a director, a principal, and a secretary, and a part-

time janitor and part-time instructors for the various classes.

The students and instructors would come from neighboring

communities in Teaneck and Fort Lee, and would be bussed to the

school.

 Kim testified that plaintiff owned three buses and two

minivans that would be used for transportation. The vehicles

would make continuous loops between pre-determined pickup

locations in other municipalities and the school. The main drop-

off point would be in the rear of the building. When questioned

 3 A-5716-14T3
if parents would be allowed to pick up their children, Kim

testified that typically Korean parents would want their children

to utilize the shuttle, but they would not be prevented from

picking up their children if they so wished, or in the case of an

emergency.

 A large portion of Kim's testimony reflected the Board's

concern about plaintiff increasing the number of students and

instructors in the future, thus requiring more parking. The Board

was also concerned about how the Township could enforce a condition

of approval that students and instructors be bussed to the school.

Addressing these concerns, Mayor Chamberlain made the following

comment:

 MAYOR CHAMBERLAIN: [I]f I may interject and,
 [plaintiff's counsel], I sat on the . . .
 Planning Board years back. And an application
 came in too many years back, but I'm here again
 — an application came in our Korean church,
 Saddle River Road. Okay. They have been here,
 bless them as the people they are,
 stipulations were made at the Planning Board
 that th[ere] would be no off-street parking.
 Okay?

 MALE BOARD MEMBER: That's the church.

 MAYOR CHAMBERLAIN: Okay. Planning Board
 approved it.

 A year-and-a-half ago I spoke with the
 Pastor of the church because there was a
 situation based upon the Planning Board's
 approval . . . that the congregation was to
 be bussed.

 4 A-5716-14T3
 All those years later, they've now
 expanded to the most magnificent building
 . . . and . . . every side street, my daughter
 lives [nearby.]

 . . . .

 MAYOR CHAMBERLAIN: Now, here becomes the
 difficulty. You're sitting here with faithful
 people, people whose parents really care about
 activity for their children. And I highly
 respect that. I wish we had more of that in
 Saddle Brook that we would like for a building
 like this and offer it to our students. And
 I respect that.

 But . . . I'm speaking to the Pastor who
 had to go speak with his board of directors
 because they were still, having completed the
 construction, and I had asked him, I said I
 really would like to go back to what the
 Planning Board approved and could you look
 into the bussing.

 Well, hence, it's a year later. My
 thought and my own calendar planning is to
 meet with the Pastor of that church again,
 because as I said earlier my daughter lives
 [on a nearby street]. I go over to see my
 grandchildren, a party on a Sunday, I can't
 get near, near the house. And she only has a
 one car driveway.

 Plaintiff's engineer, William R. Vogt, Jr. testified that

"putting aside the number of parking spaces," there would be "safe

access through the entire property for all anticipated vehicles

including [an] ambulance[.]" Vogt calculated the required parking

spaces based on the Township's ordinance, and stated:

 [A]s per your ordinance [S]ection 206-37 under
 the public and private secondary school and

 5 A-5716-14T3
 institutes for higher learning the requirement
 is one space for every classroom and every
 other room used by students plus one for every
 full-time student or one for every teacher and
 employee plus one for every full-time student
 whichever is greater.

 . . . .

 So when you work out the numbers the one
 per classroom is the more stringent number.
 So that is what the parking requirement is,
 is the [thirty-three] spaces according to our
 interpretation.

 And what we're presenting on the site,
 with the fact that two of the proposed spaces
 are substandard spaces we are providing
 [fourteen] spaces on the property.

 Vogt further testified that, assuming four instructors and

four employees drive, eight parking spaces would be sufficient.

He did not expect a "queuing of cars" due to the rate of one van

per hour dropping children off, and suggested utilizing one of the

under-sized, non-conforming parking spaces as the handicap/van-

accessible required spaces. He also testified, without direct

proof, that the Convalescent Home was required to have

approximately twenty-five parking spaces for its use, while it

only had fourteen. The Board took issue with Vogt's calculation.

The Board also questioned whether emergency vehicles would be able

to safely enter and exit the property. Vogt testified that the

parking turning radius on the existing driveway would be sufficient

for an ambulance to safely navigate.

 6 A-5716-14T3
 After further testimony from Vogt, Mayor Chamberlain stated:

 Okay. You're showing or you're trying
 to show the safety provision of an ambulance
 getting through, but I have a concern about
 the ten foot area. And now, God, forbid,
 accident, van flips over, [an] ambulance tries
 to get in.

 The measurements you gave on the van and
 the ambulance, they don’t add up to the space
 we have.

 Now, I mean you have to be prepared,
 safety issue, for any catastrophic thing
 happening in this day and age because lately
 it's a — it's catastrophic, it happens.

 Looking down the road, God forbid
 explosion. And, you know, I may be getting a
 little off the track but it's [not] so out
 there, terrorist comes in. Bomb goes off in
 [the] building.

 Now we need fire trucks. We need an
 ambulance. Now I have a building . . . that
 goes on the south side egress with the lane,
 ten-foot-three that widens to fifteen-foot-
 three. Are we going to be able to safe[l]y
 rescue any God forbid students, residents,
 without the value of having the proper width
 for ingress and egress, particularly on the
 egress side.

 Plaintiff's licensed planner, David Bilow, testified that

plaintiff's proposed use would be a less intensive use; the prior

use by the Convalescent Home was not permitted; and a vocational

school with twelve on-site parking spaces would be sufficient.

 7 A-5716-14T3
 The Board voted to deny the application, and memorialized its

decision in a February 18, 2014 resolution. Regarding a N.J.S.A.

40:55D-70(c)(1) variance, the resolution provided as follows:

 3. The Board finds that [plaintiff] has
 failed to demonstrate an undue hardship in
 conforming to the bulk zoning requirements of
 the B-2 Zone as a result of exceptional
 topographic conditions or physical features
 . . . . Rather, the existing building could
 be removed or modified by [plaintiff] so as
 to both reduce the amount of required parking
 spaces and increase the number of parking
 spaces provided on the [p]roperty. Therefore,
 the variance pursuant to N.J.S.A. 40:55D-
 70(c)(1) should not be granted.

Regarding a N.J.S.A. 40:55D-70(c)(2) variance, the resolution

provided as follows:

 5. The Board finds that [plaintiff] has
 failed to demonstrate how the benefits of the
 proposed improvements would substantially
 outweigh any possible detriment.
 [Plaintiff's] [p]lanner testified that the
 proposed use is less intense and requires
 fewer parking spaces than the former
 [C]onvalescent [H]ome on the [p]roperty did.
 However, this expert opinion was based in part
 on an assumption that the former convalescent
 home contained [two] beds per room.
 [Plaintiff] was unable to provide a factual
 basis for this assumption. In fact, the Board
 has reason to believe that the [C]onvalescent
 [H]ome may only have contained [one] bed per
 room, in which case the former use would
 require fewer parking spaces than the proposed
 school under the current Zoning Ordinance.

 6. While the Board acknowledges that the
 proposed school is a permitted use in the B-2
 Zone and that a change from a non-permitted

 8 A-5716-14T3
use to a permitted use is favored by the
[Municipal Land Use Law], the Board finds that
[plaintiff] has failed to demonstrate any
benefits to the overall community that would
substantially outweigh the detriment of the
deviation.

7. N.J.S.A. 40:55D-70(c)(2) further
provides that in order to grant variance
relief, the Board must find that the same can
be granted without detriment to the public
good or any neighboring properties, and
without substantial impairment to the intent
and purpose of the Zone Plan and Zoning
Ordinance.

8. The Board finds that the variance cannot
be granted without substantial detriment to
the public good or the neighboring properties
or without substantial impairment to the
intent and purpose of the Zone Plan. Based
upon the proposed occupancy of the building
as presented to the Board, the number of
parking spaces proposed is less than half the
number required pursuant to the Zoning
Ordinance. The Board does not find the
testimony of [plaintiff's] witnesses as to the
number of instructors to be credible and
accordingly, the Board has determined that the
demand for parking at the [p]roperty would
likely be greater than represented by
[plaintiff]. The Board further finds that
because no guarantee can be made as to any
future increase in enrollment at [plaintiff's]
school, the number of students and/or
instructors could significantly increase,
exacerbating the demand for parking and
resulting in substantial detriment to the
surrounding property owners.

9. In addition, the Board finds that the
conditions set forth on the proposed [s]ite
[p]lan present substantial safety concerns.
As set forth above, a van in the process of
loading or unloading at the rear of the

 9 A-5716-14T3
 building would prevent any other vehicle,
 including an emergency vehicle, from
 traversing the [p]roperty due to the
 narrowness of the access drives. Further, a
 van unloading a student in a wheelchair within
 the southern egress drive would prevent any
 other vehicle from exiting the [p]roperty.

 10. Based upon the foregoing, the variance
 with respect to minimum parking spaces should
 not be granted.

 Plaintiff filed a complaint in lieu of prerogative writs,

alleging: the Board's decision was arbitrary, capricious and

unreasonable because the school was a permitted, less-intrusive

and more suitable use of the property; and the objections made

about parking and other issues were too minor to deny the

application. Plaintiff also alleged that remarks about other

Korean projects in Saddle Brook indicated bias toward plaintiff

as a Korean organization, and certain Board members had a conflict

of interest.

 Judge William C. Meehan held a three-day trial, at which a

former Board member, Joseph Ribarro, Councilman Joseph Conte, and

Chamberlain testified. Ribarro testified as follows:

 Q: Did anyone, whether a board member or not
 ever tell you not to support [plaintiff's]
 application?

 A: No.

 Q: Did anyone at any time indicate to you
 that the application should not be supported

 10 A-5716-14T3
 because the people behind the applicant were
 Korean?

 A: No, I'm not going for that type of
 communication.

 Q: Did you have any problem with the fact
 that the applicant was Korean?

 A: No.

 Q: Did you hear any board member express any
 bias against the applicant because it was or
 its [principals] were Korean?

 A: Somebody might— someone might have said
 something, but I don't recall.

 . . . .

 A: If I recall, I think someone was talking
 about the parking at the Korean Church, which
 had nothing to do with this application, that
 they had problems there with parking.

Conte testified as follows:

 Q: Did you hear anyone, whether in the
 meeting or outside the meeting make reference
 to the fact that the applicant was Korean?

 A: No.

 Q: Did you have any issue regarding the
 applicant as Korean for purposes of their
 development application?

 A: No.

 Q: During the hearing you made reference to
 possible stacking or backup of vehicles with
 respect to the possible drop off and pick up
 of students. Do you recall that?

 11 A-5716-14T3
 A: It's been a few years, yeah. So many
 things I think were said, yes. Yes.

 Q: Are you aware during your two years on
 the board, the issues where bombings,
 shootings, or terroristic attack being raised
 with respect to any other applicants?

 A: No.

 Q: This is the only one. Correct?

 A: Yes. I don't even— I don't even recall
 that to be honest with you.

 When asked why she referenced the parking issue at the nearby

Korean church, Chamberlain testified as follows:

 A: Okay. I made reference because when I
 was Mayor for my first term, my five years, I
 sat on the planning board for that
 application. Now the planning board that I
 was sitting with currently from 2011, my last
 four years, there were new members there. And
 we have three churches on Saddle River Road.
 So in order for me to convey to the new members
 I pointed out the Korean Church experience,
 because of the two other churches on Saddle
 River Road.

 And I did not know any address, with a
 number.

 . . . .

 Q: Okay. So again, why the reference to a
 Korean Church for an application for a
 vocational school not on the same road?

 A: The reason being the applications were
 similar in nature regarding parking.

 . . . .

 12 A-5716-14T3
 A: Well when the . . . Korean Church on
 Saddle River Road came in for the application,
 there was insufficient parking. However it
 did pass. And it was memorialized that there
 be no off-street parking. However, as the
 years went on, the parking lot not only
 congested to the point of the curb, which
 would cause a safety issue for an ambulance
 or a fire truck to get in, and I had been in
 the midst of current mayorship, speaking with
 the pastor. And I had made a comment to him.
 And we were working on the parking issue,
 because I had said, as an example, God forbid,
 if one of your members of the congregation has
 a heart attack the ambulance cannot get in
 there or a fire truck. So that was my concern
 and my experiences from that application.

 Relative to this application, even though
 it wasn't a church, I felt that they were
 similar in nature regarding the safety of
 those students. And the fact of enforcement
 on the church application, the memorialization
 as I stated earlier said, our building
 inspector doesn't work Sundays, police work
 is at a minimum, so the enforcement issue is
 not there.

 . . . .

 Q: Of the three churches you mentioned on
 Saddle River Road did all of them have parking
 issues on Sunday?

 A: Not to my knowledge, sir.

 Q: Just the Korean church?

 A: Yes, sir.

Chamberlain also testified that she did not raise issues of

shooting, terrorism, or explosions on any other applications

during her time as mayor.

 13 A-5716-14T3
 In a June 22, 2015 written opinion, Judge Meehan found as

follows:

 In the present matter, the Board's
 decision was not arbitrary, capricious or
 unreasonable. The Board's decision to deny
 the variance relief sought by plaintiff was
 based on a reasonable belief that parking and
 traffic would be an issue at the Property.
 The resolution clearly details these concerns.
 Although plaintiff's experts testified that
 twelve parking spaces are sufficient for the
 proposed use, the Board had legitimate
 concerns. There is no way for the Township
 of Saddle Brook or the Board to enforce the
 bussing of students and teachers to the site.
 If parents begin to drive their children to
 the Property instead of utilizing the bussing
 system, there will be an influx of traffic
 during drop off and pick up times, and no way
 for the Township to enforce use of the buses.
 For those reasons, the court also finds that
 plaintiff has not sufficiently proven that the
 vocational school requires fewer parking
 spaces than the convalescent home that was
 previously operating on the Property.

 Additionally, the fact that plaintiff
 seeks to convert the Property into a
 conforming use is also not dispositive here.
 Regardless of that fact, the Property requires
 a parking variance, and the Board's parking
 and traffic concerns are not negated simply
 because the site conforms to the local zoning
 code and ordinances.

 Further, the court finds that bias
 towards Koreans did not play a role in the
 Board's decision. Review of the record below
 indicates that the board members referenced
 other Korean properties that did not relate
 to the present site. However, those
 references were relevant to the present
 application in that there were traffic and

 14 A-5716-14T3
 parking issues relating to those sites. The
 fact that properties were owned and operated
 by Koreans did not play a role in the decision-
 making process. Additionally, the Board made
 inquiries regarding the safety of the building
 and its future students. These inquiries were
 warranted given the recent current events in
 schools. The fact that the issue of safety
 was not raised at another hearing for a
 different type of application for a school is
 not dispositive. Child safety is a legitimate
 concern, and the Board acted within its
 authority when it addressed this issue.

On July 8, 2015, the judge entered an order of judgment affirming

the Board's decision. This appeal followed.

 In reviewing a planning board's decision, we use the same

standard used by the trial court. Cohen v. Bd. of Adjustment of

the Borough of Rumson, 396 N.J. Super. 608, 614-15 (App. Div.

2007) (citations omitted). Like the trial court, our review of a

planning board's decision is limited. Smart SMR of N.Y., Inc. v.

Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 327 (1998).

We give deference to a planning board's decision and will reverse

only if its action was arbitrary, capricious, or unreasonable.

Zilinsky v. Zoning Bd. of Adjustment of Verona, 105 N.J. 363, 367

(1987).

 We give even greater deference to a planning board's decision

to deny a variance in preservation of a zoning plan than a decision

to grant a variance. Nextel of N.Y., Inc. v. Borough of Englewood

Cliffs Bd. of Adjustment, 361 N.J. Super. 22, 38 (App. Div. 2003).

 15 A-5716-14T3
Where a planning board has denied a variance, the applicant must

prove that the evidence before the board was "overwhelmingly in

favor of the applicant." Ibid. However, where the issue on appeal

involves a purely legal question, we afford no special deference

to the trial court's or the planning board's decision, and must

determine if the board understood and applied the law correctly.

D. Lobi Enters., Inc. v. Planning/Zoning Bd. of the Borough of Sea

Bright, 408 N.J. Super. 345, 352 (App. Div. 2009). Applying the

above standards, we discern no reason to disturb the Board's or

Judge Meehan's decision.

 II.

 Plaintiff contends that because the proposed use would bring

the property into conformity with the zoning code and would be a

less-intense, more suitable use than the former Convalescent Home,

the objections made concerning parking and other issues were too

minor a basis to deny the application. We disagree.

 The issue here and throughout the Board hearings and trial,

centered wholly on parking. Plaintiff's argument as to the

Convalescent Home is entirely misplaced. It is immaterial how

many parking spaces that use would have required. The Convalescent

Home began operating in the 1960's, well before the adoption of

the current zoning plan. Whether or not the Convalescent Home was

conforming as to parking is, thus, totally immaterial. Plaintiff's

 16 A-5716-14T3
application was judged on its own merits and based on the current

zoning ordinance and current safety and emergency concerns.

Plaintiff's argument is essentially that because the Convalescent

Home did not have sufficient parking, it should not be required

to have sufficient parking as well. This is counter to the

Municipal Land Use Law and applicable case law.

 Parking is a valid, legitimate focus of both sound planning

and zoning. "One of the purposes of zoning is to lessen vehicular

congestion in the streets and highways." Wawa Food Mkt. v.

Planning Bd. of Ship Bottom, 227 N.J. Super. 29, 35 (App. Div.),

certif. denied, 114 N.J. 299 (1988) (citing N.J.S.A. 40:55D-2(h)).

"A necessary corollary to that purpose is that off-street parking

requirements also advance the legitimate municipal interest in

decreasing traffic congestion since vehicles, which would

otherwise park on the streets, are required to park on the proposed

site." Ibid. (citing Zilinsky, supra, 105 N.J. at 369). In short,

plaintiff's application failed to ameliorate the legitimate

concerns of the Board concerning: (1) intensity of the parking;

(2) the lack of spaces; (3) the enforceability of the bussing of

students as opposed to regular pick-up and drop-off; and (4) the

lack of available handicap spaces. Accordingly, in denying the

parking variance, the Board's action was not arbitrary,

capricious, or unreasonable.

 17 A-5716-14T3
 Plaintiff continuously maintains that the Board should have

granted the parking variance because it produced unrefuted,

uncontradicted expert testimony. However, this argument misses

the point, as it is the applicant's burden of proof to meet the

criteria necessary for a variance; the Board has no similar burden.

 Very often it happens that only the applicant
 submits any evidence to the board but it
 should be noted that the absence of evidence
 in support of a denial of a requested variance
 does not in itself mean that the board's
 denial of a variance is arbitrary. The burden
 rests with the applicant to establish the
 criteria for the grant of the variance and it
 must demonstrate the affirmative evidence in
 the record dictates the conclusion that a
 denial would be arbitrary.

 [Cox & Koenig, New Jersey Zoning and Land Use
 Administration, § 18-4.3 at 372-73 (2017).]

See also Kenwood Assocs. v. Bd. of Adjustment of Englewood, 141

N.J. Super. 1 (App. Div. 1976).

 Plaintiff also points to two other applications the Board

heard, and contends that the Board did not voice similar concerns

in those applications as the ones raised in its application.

Plaintiff provided to Judge Meehan an application for a senior

apartment complex and a daycare and maintained that no concerns

about emergencies were voiced during those hearings and that those

applicants received the necessary approvals. This argument is

misplaced because, generally, other applications before the same

 18 A-5716-14T3
board do not present any kind of precedent and each application

is judged on its own merits. "Generally speaking, the granting

of a variance to one property owner does not create a precedent

for the granting of a variance to other property owners, since

each variance must stand or fall on its own peculiar factual

circumstances." Cox & Koenig, supra, § 28-3 at 605; see also Kohl

v. Mayor & Council of Fair Lawn, 50 N.J. 268, 276 (1967).

 In sum, plaintiff failed to meet the statutory criteria for

the required site plan and parking variance approvals.

Accordingly, the Board's decision was not arbitrary, capricious,

or unreasonable.

 III.

 Plaintiff contends that the Board, and Chamberlain in

particular, exhibited racial bias against plaintiff because it is

a Korean organization. Plaintiff asserts that the references made

about other Korean establishments, particularly a Korean church

in the municipality, and raising issues of explosions, terrorism,

and bombs, were inappropriately directed only at plaintiff's

application.

 Chamberlain testified as to why she made the complained-of

comments. First, the comments had nothing to do with either

plaintiff or the church being of Korean heritage. Rather,

Chamberlain used that identifier simply to distinguish it from

 19 A-5716-14T3
three other churches located on the same road as the Korean church.

She also stated that none of the other churches had a similar

parking problem.

 Chamberlain's comments were pertinent to plaintiff's

application in that the church she referenced was granted a

variance conditioned on a certain level of parking. When the

church violated the condition, the Township had limited

enforcement power. Chamberlain raised the issue again in

plaintiff's application because much of the testimony regarding

staffing and student levels and parking was based solely on Kim's

testimony with no promise or requirement that the levels would not

increase in the future. Accordingly, there were legitimate reasons

for this discussion and it is clear that racial bias played no

part in the denial of plaintiff's application. Similarly, the

concerns about terrorism and other violent concerns were

reflective of a perceived rise in the number of such incidents in

schools in particular. Plaintiff's argument on this point simply

lacks merit.

 IV.

 Plaintiff contends that Chamberlain and Conte failed to

disclose that the Township had previously commissioned a study of

plaintiff's property for its suitability as affordable housing for

 20 A-5716-14T3
the elderly. Plaintiff argues that this conflict of interest was

never revealed and tainted the Board's decision on its application.

 Pursuant to N.J.S.A. 40:55D-23(b), as applicable to planning

boards, "[n]o member of [the board] shall be permitted to act on

any matter in which he has, either directly or indirectly, any

personal or financial interest." Our Supreme Court has defined

the general contours of conflicts:

 (1) "Direct pecuniary interests," when an
 official votes on a matter benefitting the
 official's own property or affording a direct
 financial gain; (2) "Indirect pecuniary
 interests," when an official votes on a matter
 that financially benefits one closely tied to
 the official, such as an employer, or family
 member; (3) "Direct personal interest," when
 an official votes on a matter that benefits a
 blood relative or close friend in a non-
 financial way, but a matter of great
 importance, as in the case of a councilman's
 mother being in the nursing home subject to
 the zoning issue; and (4) "Indirect [p]ersonal
 [i]nterest," when an official votes on a
 matter in which an individual's judgment may
 be affected because of membership in some
 organization and a desire to help that
 organization further its policies.

 [Wyzykowski v. Rizas, 132 N.J. 509, 525
 (1993).]

Whether a conflict "is sufficient to disqualify is necessarily a

factual one and depends upon the circumstances of the particular

case." Id. at 523 (quoting Van Itallie v. Franklin Lakes, 28 N.J.

258, 268 (1958)). "The question will always be whether the

 21 A-5716-14T3
circumstances could reasonably be interpreted to show that they

had the likely capacity to tempt the official to depart from his

sworn public duty." Ibid.

 Plaintiff's argument fails for several reasons. First,

plaintiff never requested that any of the Board members recuse

themselves. Plaintiff was fully aware of the purported conflict

because it was plaintiff's counsel who introduced the report

commissioned by the Board into evidence at the hearing. However,

even then, plaintiff's counsel's comments indicate that he

introduced the report to contrast the Board's interpretation as

to what was considered a permitted use, not to establish a conflict

of interest.

 Second, plaintiff has not argued, nor is there any evidence,

that the alleged conflict fits into any of the categories

enunciated in Wyzykowski. The actions taken by Chamberlain or

Conte represent the interests of the municipality, not either

individual personally.

 Finally, plaintiff has not shown how the alleged conflict

tainted the Board's decision. Plaintiff merely presented a report

commissioned by the Board on behalf of the Township over a year

and one-half before plaintiff's application. Plaintiff's

conclusion that Chamberlain and Conte were "protecting the

 22 A-5716-14T3
Township's interest rather than deciding [plaintiff's] proposal"

is mere speculation.

 V.

 Plaintiff contends that the preexisting nonconforming parking

lot should be entitled to continue under its use of the building.

We disagree.

 N.J.S.A. 40:55D-68, which addresses preexisting nonconforming

structures, provides: "Any nonconforming use or structure existing

at the time of the passage of an ordinance may be continued upon

the lot or in the structure so occupied and any such structure may

be restored or repaired in the event of partial destruction

thereof." Specifically as applied to parking, if a property owner

operated without existing off-street parking, it would be

permitted to continue to do so even after the adoption of a zoning

ordinance requiring off-street parking. See Dresner v. Carrara,

69 N.J. 237 (1976); Ric-Cic Co. v. Bassinder, 252 N.J. Super. 334

(App. Div. 1991) (applying the same principle to protect a

nonconforming parking arrangement while the business was being

physically rebuilt).

 In Wawa Food Market, supra, we distinguished a situation like

that in Dresner and an application for a parking variance. We

wrote:

 23 A-5716-14T3
 However, unlike the existing building, which
 establishes a "footprint" on the character of
 the property precluding compliance with the
 set-back requirements, the number of parking
 spaces is computed based on floor area and the
 number of employees. Thus, the number of
 parking spaces required is dictated by the
 extent and manner by which the facility is
 used, not the preexisting nature of the
 structure. Distinguishable is the case where
 property has been used for a particular
 business purpose since prior to the passage
 of an off-street parking ordinance. In such
 a circumstance, where the nature and intensity
 of the business remains the same, continued
 use of the property without off-street parking
 is protected as a nonconforming use.

 [Wawa Food Market, supra, 227 N.J. Super. at
 37-38.]

Thus, the only exception to a valid conforming parking variance

is a nonconforming use which will remain of the same nature and

intensity as the prior user. Here, such is not the case. The

prior use was by the Convalescent Home, which provided full-time

care for elderly residents. Parking included employees,

residents, and visitors. Plaintiff's proposed parking is very

different. Its proposed use of the property involved busses

shuttling students and staff to the site. Even a less intense

use, as plaintiff argues this would be, is still a difference in

use. Accordingly, the nonconforming parking lot should not have

been protected for plaintiff's benefit.

 24 A-5716-14T3
 VI.

 Lastly, plaintiff contends that the Board's written

resolution memorializing its decision "cites reasons for the

Board's actions, but which reasons are utterly lacking in

evidentiary support and are not found in the transcript of the

hearing."

 Pursuant to N.J.S.A. 40:55D-10(g), the planning board's

decision must include findings of fact and conclusions based

thereon. Mere recitals of testimony do not satisfy this

responsibility. Loscalzo v. Pini, 228 N.J. Super. 291, 305 (App.

Div. 1988), certif. denied, 118 N.J. 216 (1989). If a variance

is denied, the factual findings must not merely recite but instead

must demonstrate with reference to facts and testimony on the

record that there is no hardship or that no special reasons exist,

or otherwise that the statutory requisites for the grant of a

variance are absent. See Cox & Koenig, supra, § 19-7.2 at 435.

 The Board's resolution adequately complies with this

statutory mandate. The statutory criteria and the Board's reasons

for denying the application are considered together and the Board

made supported conclusions based on the factual record. The

resolution discusses the application of both (c)(1) and (c)(2)

variances and how plaintiff failed to meet its burden or address

the Board's persistent concerns regarding parking and safety.

 25 A-5716-14T3
Affirmed.

 26 A-5716-14T3